445 So.2d 1155 (1984)
STATE of Louisiana
v.
James Louis HUMPHREY.
No. 82-KA-2141.
Supreme Court of Louisiana.
January 16, 1984.
*1156 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Leonard Knapp, Jr., Dist. Atty., Eugene Bouquet, Robert R. Bryant, Jr., Asst. Dist. Attys., for plaintiff-appellee.
Richard P. Ieyoub, Thomas L. Lorenzi, Lake Charles, for defendant-appellant.
CALOGERO, Justice.
In this appeal following a jury's finding the defendant guilty of two counts of manslaughter, for the reasons which follow, we affirm the defendant's conviction and sentence on each count to fifteen years at hard labor with the sentences to run consecutively.
This case has had a somewhat lengthy procedural history. The matter first came to this Court on a pre-trial writ which was granted in order to decide whether evidence of prior offenses would be admissible. In State v. Humphrey, 381 So.2d 815 (La.1980), we decided that evidence of simple batteries committed upon the same victims on April 25, 1978, three days before the fatal April 28, 1978, beatings was admissible. Humphrey's case was then remanded to the district court for trial on the merits. Thereafter he was convicted and sentenced to fifteen years at hard labor on each count of manslaughter, with the sentences to run consecutively. Defendant appealed his conviction and sentence. The conviction was conditionally affirmed by this Court pending disposition on remand for the trial court's consideration of the proffered evidence of a polygraph examination and for a trial court ruling on a motion for a new trial, to be accomplished prior to resentencing. State v. Humphrey, 412 So.2d 507 (La.1981). A rehearing was granted. The original opinion was reinstated.[1] Accordingly a hearing on the motion for a new trial was conducted at which the trial court received evidence of Humphrey's post-verdict polygraph examination and the newly discovered evidence of a polygraph examination administered about one year prior to the trial on the merits to one Mona Brouchet, the mother of the deceased *1157 infant children. At the hearing's conclusion the trial court denied the motion for a new trial and resentenced defendant to fifteen year terms at hard labor on each count, to run consecutively. Defendant appeals the trial court's ruling and the reimposed sentence contending that the trial court erred in denying his motion for a new trial and that the sentence he received was excessive. Upon review and for the reasons which follow, we affirm both his conviction and sentence.
The facts of this case are the following:
James Humphrey and his common law wife Mona Brouchet lived together in Lake Charles with their two infant daughters; Janice, age 22 months and Latasha, age 9 months at the time of their death. On Friday, April 28, 1978, after feeding both girls, Mona Brouchet left them at home with Humphrey allegedly around 6:00 p.m. while she spent the evening with other family members at the home of Humphrey's father. Shortly after Mona left, Joseph Breaux, a seven year old neighbor saw Janice outside alive. Around 9:00 p.m., Humphrey's sister, Della Lane, came to the house but did not enter when she saw Humphrey asleep on the bed with the children. Sometime after 10:00 p.m., the defendant woke up and apparently thought something was wrong with the children. He walked to the park about two blocks away. After a while in the park, he met a friend Howard, and told him that Mona had done "something bad, bad, bad" to the children and that he was afraid that he might go to jail for it. Around 11:00 p.m. Humphrey's relatives drove past him in the park, stopping briefly to tell him that they had dropped Mona off at the house. Humphrey and his friend Howard walked back to the house. Allegedly when Humphrey saw Mona smiling, he assumed that the children were all right. The three adults played cards without discussing the children. However Mona allegedly checked the girls at some point for wetness or a fever. Howard left sometime after midnight. Shortly thereafter Humphrey and Mona went to sleep.
Both awoke around eight o'clock the following morning. Humphrey offered to go to the store while Mona stayed at home to "clean up" the children. Allegedly it was then that Mona discovered that something was wrong with them and went, at Humphrey's instruction, to a neighbor's to call for assistance.
After trial on the merits, a jury found Humphrey guilty of two counts of manslaughter in connection with the deaths of his infant daughters, Janice and Latasha Brouchet.

ASSIGNMENT OF ERROR NUMBER ONE
The defendant contends that the trial court erred as a matter of law in denying his motion for a new trial. This contention originates in the administration of two polygraph examinations.
Subsequent to his guilty verdict and sentence and in connection with his motion for a new trial, Humphrey requested that he be administered a polygraph examination. This request was denied, but with remarks by the sitting judge that polygraph results might be considered in a later motion for a new trial, were Humphrey to have a polygraph examination performed at his own expense. Accordingly, defense counsel arranged for a polygraph examination to be administered to defendant James Humphrey, in DeRidder, Louisiana by Joe Bartlett, chief deputy with the Beauregard Parish Sheriff's Department and a court-qualified expert in polygraph examinations. The results indicated that Humphrey was not being deceptive in his answers. What happened thereafter is summarized at 412 So.2d 517 as follows:
When the trial judge was not available on the last day for filing of the appeal, defendant requested another district judge to hear and pass on his motion proferring the polygraph examination. Defendant sought to have the proffered examination admitted as a supplement to the record for review by this court of the trial court's denial of the motion for a *1158 new trial. The district judge hearing the proffer motion denied the proffer.
On appeal, we directed that on remand "the trial judge consider the proffered evidence in light of defendant's prior motion for a new trial and again pass upon defendant's motion for a new trial before resentencing." 412 So.2d 518.
Then, in conjunction with that remand for hearing on motion for new trial and for resentencing, the defense was told by law enforcement officers that a polygraph examination had been administered approximately one year prior to trial to Mona Brouchet, the then common law wife of James Humphrey and mother of the two slain infant children. This examination took place at the request of George Perez of the district attorney's office and was administered at the Calcasieu Parish Sheriff's department by Deputy Carl Chism, also a court qualified expert in polygraph examination. That examination indicated that Mona Brouchet was being deceptive in her answers.
At the hearing on the motion for a new trial, the defense requested and was permitted to introduce evidence of Mona Brouchet's polygraph as well as that of Humphrey. The trial judge considered evidence of both polygraph examinations, but concluded that Humphrey's motion for a new trial should nonetheless be denied.
Based on these polygraph results, the defendant contends essentially that there are two reasons for granting a new trial under La.C.Cr.P. art. 851.[2]
In the first place, the defendant argues that his post-verdict polygraph examination, although inadmissible at a new trial, was allegedly corroborated by Mona Brouchet's pre-trial polygraph examination and so purportedly exonerates him in the murder of his two children. Therefore he contends that the jury's guilty verdict was contrary to the law and the evidence and a new trial would serve the ends of justice. La.C.Cr.P. art. 851(1) and (5).
In the second place, the defendant contends that Mona Broucher's pre-trial polygraph results indicating her deceptive responses as a key witness constitute new and material evidence which evidence was improperly withheld from the defense prior to trial in violation of the defendant's constitutional rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny.
We find neither argument persuasive.
Polygraph examination information and results are inadmissible at Louisiana criminal trials "either as substantive evidence or as relating to the credibility of a party or witness." State v. Tonubee, 420 So.2d 126 at 132 (La.1982). Neither polygraph could have been used in Humphrey's original trial, nor might either be used at any new trial, should Humphrey be afforded one.
Nonetheless State v. Catanese, 368 So.2d 975 (La.1979) in dicta advanced the opinion that a trial judge may consider polygraph evidence in the context of a motion for a *1159 new trial. In Catanese, we said at 368 So.2d 982, 983:
Although we conclude that polygraph evidence is inadmissible in criminal trials, the reasons for our decision do not prevent its introduction in post trial proceedings, within judicial discretion and subject to guidelines such as those laid down by the trial judge in the instant case. Because the defendant's guilt or innocence is not at issue in such proceedings, there is less demand for the rigorous guarantees of accuracy which typify the rules governing introduction of evidence at trial. Consequently, the reasons for excluding polygraph evidence in criminal trials are not necessarily compelling in post trial proceedings.
Catanese clearly did not say that the results of polygraph examinations in and of themselves are sufficient to warrant the granting of a new trial. Catanese simply permits their introduction in post trial proceedings "within judicial discretion and subject to [certain] guidelines,"[3] in order to assist the trial judge in his post-trial deliberations and to be considered along with whatever other evidence is presented in those proceedings. If anything, Catanese recognized the dangers inherent in an inflexible approach, which might automatically accept polygraph results as sacrosanct.[4]
The introduction of polygraph examinations are allowed at the post-trial deliberations because the judge can properly assess and weigh the polygraph's validity and results with the other considerations and testimony presented in the post-trial proceedings. The weight to be given to such evidence is within the discretion of the trial judge. Catanese, supra.
Furthermore, review by this Court of the trial court's denial of a motion for a new trial based on an assertion that the verdict is contrary to the law and the evidence is limited to the question of whether the trial judge has properly exercised his discretion in that regard. State v. Caminita, 411 So.2d 13 (La.1982); State v. Turner, 365 So.2d 1352 (La.1978). The trial judge when called upon to assess the legal merits of a motion for a new trial is *1160 accorded considerable latitude in evaluating the reliability of evidence and its potential impact on the verdict; his ruling will not be disturbed on appeal in the absence of a clear showing of an abuse of discretion. State v. Fuller, 414 So.2d 306 (La. 1982); State v. Molinaro, 400 So.2d 596 (La.1981); State v. Jones, 344 So.2d 1036 (La.1977).
At the hearing on the motion for a new trial, Joe Bartlett, deputy of the Beauregard Parish Sheriff's office, testified concerning his administration of the polygraph examination to James Humphrey, the techniques and questions used and his opinion regarding the results of that testing. Deputy Bartlett believed that Humphrey was not being deceptive when he denied harming his two infant children. Deputy Bartlett also testified that he reviewed the charts of the polygraph examination that Deputy Chism had given the children's mother. Those charts in his opinion indicated that Mona Brouchet was being deceptive when she disclaimed knowledge about the cause of her children's deaths and their well-being when she had left the house and returned later.
On cross-examination the state disputed Bartlett's qualifications and record as a polygraph examiner. The state also emphasized that there had been a lapse of two years and three months between the infants' deaths and Humphrey's post verdict polygraph examination; that Deputy Bartlett had not reviewed the trial transcript in preparing for administering the polygraph examination; and that Deputy Bartlett had been wrong in at least one prior evaluation involving a child's death.
Deputy Chism of the Calcasieu Parish Sheriff's Department testified to the events surrounding his administration of the pre-trial polygraph examination to Mona Brouchet. Deputy Chism had found her a difficult subject with whom to work because she was reluctant to give any sort of definite answer. If her response appeared to offend the examiner, she would change it. Deputy Chism testified that Mona Brouchet was inconsistent on everything she told him. Furthermore she would not explain her inconsistencies. Deputy Chism had also reviewed the charts that Deputy Bartlett had compiled on the Humphrey examination and agreed that those records indicated no deception on Humphrey's part when he was asked about harming the children.
As its witness, the state called Rodney Steed, formerly the chief polygraph examiner for the Department of the Air Force. Steed testified that a two year and three month delay in the administration of a polygraph examination would diminish the reliability of the test results. Furthermore an examiner with strong feelings toward the subject cannot administer, in his opinion, an impartial examination. (We note that Deputy Bartlett admitted that he had "formed very strong opinions about this entire case," and that he had been wrong in his conclusions on several prior polygraph examinations, including one involving the death of a child.) Finally, he stated that even a guilty person may so mentally resolve an event that rationalization occurs. Such rationalization after a significant lapse of time may result in a lack of appropriate reaction during the course of a polygraph examination.
At the conclusion of this hearing, the trial judge denied the defendant's motion for a new trial. Given the testimony at the hearing, we do not find that the trial judge abused his discretion in concluding that the polygraph results did not warrant granting a new trial under La.C.Cr.P. art. 851(1) and (5) [verdict contrary to the law and the evidence; interest of justice].
In like manner and for the reasons which follow, we also do not find a new trial should have been granted under La.C.Cr.P. art. 851(3) and (4) [newly discovered evidence; prejudicial error].
In response to a motion for discovery and inspection, the state provided the defense with two written statements that Mona Brouchet had given officers of the Lake Charles Police Department. Apart from disclaiming any knowledge of what or who had caused the deaths of her two infant *1161 daughters, Mona Brouchet had also stated that she had checked on the girls after returning from Humphrey's father's house around midnight and that they were all right. The defense used these two statements to impeach Mona Brouchet at trial.
As stated earlier, the defense was not informed until the remand of this case after appeal that Deputy Chism had interrogated and polygraphed Mona Brouchet before that, nor had the defense formerly been provided with interrogation or test records, or Deputy Chism's name for interview purposes. This, the defense contends, violates Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and the continuing duty of the state under the discovery provision, La.C.Cr.P. art. 729.3.[5] Irrespective of the admissibility of polygraph information and results at trial, defense counsel argues that had he known about the Chism interview with and examination of Mona Brouchet, he could at trial have better cross-examined Brouchet, a key prosecution witness, and he could have subpoenaed Deputy Chism as a defense witness to illustrate inconsistencies in Mona Brouchet's story.
The state counters this argument by suggesting that it too was, until recently, unaware of Mona Brouchet's polygraph examination. Allegedly, George Perez originally handled the prosecution of this case for the district attorney's office in Calcasieu Parish, and was the person who requested that a polygraph be given to Mona Brouchet, originally a co-defendant in the case. Shortly thereafter, Perez moved to a new section and Robert Bryant took over the prosecution of this case, having no information that a polygraph test was to be or had been conducted on Mona Brouchet.
At the hearing on the motion for a new trial, Deputy Chism corroborated the fact that George Perez of the Calcasieu Parish district attorney's office had contacted him to run the polygraph on Mona Brouchet. Two or three weeks after the administration of the polygraph, Deputy Chism tried to contact George Perez; however, Chism testified, he had been moved to another department. Carl Chism's testimony indicates that apparently no one in the district attorney's office except George Perez was aware of the polygraph examination. Chism's only contact with the district attorney's office after administering the test on May 5, 1979, was a brief visit with a parish investigator at the courthouse after Humphrey's trial began on June 11, 1980, at which Chism thought he mentioned that Mona Brochet had been deceptive during the interview and examination that he conducted on her the year before.
Assistant District Attorney Bryant for the state contends that the first time he saw the report or charts of this examination was after its remand following appeal, on the day of the evidentiary hearing on the motion for a new trial and some two years after the polygraph test had been given to Mona Brouchet. Deputy Chism brought the charts of Mona Brouchet's polygraph examination with him to the hearing on the motion for a new trial, but no other evidence relative to the polygraph examinations has been admitted into the record of this case.[6]
There has been presented no conclusive proof that the prosecutor became aware *1162 during Humphrey's trial that a pre-trial polygraph examination of Mona Brouchet showed deceptive responses to questions about her children's well-being the night of April 28, 1979. If this knowledge were conceded, the question would then become whether the withholding of this information from the defendant constitutionally violates his right to a fair trial.
In State v. Roussel, 381 So.2d 796 at 798 (La.1980), we said:
When the reliability of a witness may be determinative of guilt or innocence, evidence which impeaches the testimony of that witness may fall within the Brady rule that the state must disclose material exculpatory evidence. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); State v. Bailey, 367 So.2d 368 (La.1979). We assume without deciding that the material here is Brady information which should have been disclosed prior to trial. However, the finding that the state should have disclosed certain information prior to trial and did not, does not necessarily require that a defendant's conviction be reversed. State v. Falkins, 356 So.2d 415 (La.1978).
Reversal of a conviction is not required under Brady unless the omission of the non-disclosed evidence deprived defendant of his constitutional right to a fair trial. State v. Falkins, supra. The United States Supreme Court in United States v. Agurs stated the test an appellate court must use in determining whether defendant's right to a fair trial has been violated by the non-disclosure of evidence, where, as in the instant case, only a general request for exculpatory material has been made:
It necessarily follows that (in a post-trial hearing by the court) if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. United States v. Agurs, 427 U.S. 97, 113, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976). (Emphasis provided.)
Furthermore the test to be employed in considering a motion for a new trial based on newly discovered evidence is whether that new evidence is so material that it ought to produce a different result than the verdict reached not simply whether another jury might bring in a different verdict. State v. Bryan, 427 So.2d 1169 (La.1983); State v. Molinario, 400 So.2d 596 (La.1981); State v. Williams, 362 So.2d 530 (La.1978); State v. Motton, 395 So.2d 1337 (La.1981), cert. denied, 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139 (1981); State v. Shannon, 388 So.2d 731 (La.1980); State v. Reed, 378 So.2d 923 (La.1979); State v. Bell, 377 So.2d 275 (La.1979). The trial judge is accorded considerable discretion in evaluating the impact of such newly discovered evidence on the verdict; his ruling will not be disturbed on appeal unless there is a clear showing of an abuse of discretion. Bryan, supra; State v. Clayton, 427 So.2d 827 (La.1982); State v. Talbot, 408 So.2d 861 (La.1980) (On Rehearing).
With these principles in mind and faced with the allegation that new and material evidence was withheld by the state in violation of Brady and its progeny, we must examine the entire record including the content, character, and impact of Ms. Brouchet's testimony at trial, the ability of the defense to impeach that trial testimony, Humphrey's testimony on his own behalf and that of other witnesses to determine "if the omitted evidence creates a reasonable doubt that did not otherwise exist." Roussel, 381 So.2d at 798, quoting Agurs. In Roussel[7] the Court found that even *1163 though it would have been preferable for the information to have been disclosed prior to trial, the defendant's late discovery of the alleged exculpatory information did not deprive the defendant of an opportunity to present effectively the alleged Brady material to the trier of fact. We find this ruling analogous to the one in the instant case.
Even though the defense was not informed about Mona Brouchet's pre-trial polygraph examination until after the conclusion of Humphrey's trial for manslaughter, the defendant was not deprived of an opportunity to question Mona Brouchet about the events surrounding her daughter's deaths. Nor was the defendant deprived of a thorough opportunity to impeach Mona Brouchet at trial.
The state says in its brief that Mona Brouchet was called to testify at Humphrey's trial to show her to be, as admittedly she is, a small, frail woman of apparently limited intelligence, and to remove her as a possible suspect by showing her to be unable to perform the fatal beatings[8] and to have been absent when they occurred. Even though her trial testimony was at times disjointed and contradictory on both direct and cross-examination, it seems that the two girls were alive when she left to visit Humphrey's relatives around six o'clock the evening of Friday, April 28, 1979, and she left them in Humphrey's care. When she returned around eleven, she first said in her statement to the authorities that the children were alive, that she checked to see if one needed changing. In another version she said she checked to see if one had a fever. At trial she recanted this testimony and said that she did not touch either girl but that she thought they were breathing because Janice had a smile on her face. When asked about her inconsistencies she said she could not remember what she had said because she was so upset.
Nonetheless the defense contends that had it known about the Brouchet polygraph examination, it could have called Deputy Chism and questioned him about his pre-test interview with Mona Brouchet, about her demeanor and about her forthrightness or lack thereof in order to impeach her trial testimony and the statements that she had given to the authorities concerning the incident. After reviewing Mona Brouchet's testimony at trial, however, it is evident that the defense was clearly and effectively able to impeach Mona Brouchet's testimony and statements without the assistance of Deputy Chism. Her testimony was evasive, and at times non-responsive. When questioned about her facts within prior written statements to the authorities she contradicted them while maintaining that she was not changing her answers. The jury was surely able to discount most of what she said both then and earlier.
More significant in terms of the jury's verdict of guilty than Mona's inconsistent testimony, was the fact that Mona's testimony concerning the time of her leaving and the time of her returning to her house was corroborated by several witnesses, including a young boy living next door to Humphrey and Brouchet and several of Humphrey's own relatives. These witnesses confirm that Mona left her house and arrived at Humphrey's father's around six o'clock or six-thirty. (The six o'clock news was on.) Humphrey's relatives confirm that Mona spent the evening with them, was driven home and dropped off around eleven o'clock. (The ten o'clock news had come on before they left to drive Mona home and they had stopped briefly at a grocery store on the way.) After dropping *1164 Mona at her house, they drove through the park and, seeing Humphrey, stopped briefly to tell him that Mona was home.
Additional testimony was admitted concerning an earlier incident where Mona had called the police to report Humphrey's beating her and the girls. (This was the "other crimes evidence" which this Court had found admissible both pre-trial and in its review on appeal prior to remand.) When the officers arrived, Mona said that everything was all right, and indeed it looked that way, according to the testimony of the reporting officers at trial. However, another trial witness confirmed the presence of bruises on the girls the day after the police had been called by Mona to come out to the house.
On his own behalf, Humphrey testified consistently that he did not arrive home until around 8:30 p.m., that Mona was there when he arrived, and that she left shortly thereafter to visit his father. Defense counsel in his closing argument highlighted the marked contrast between the consistent story that Humphrey was presenting and the inconsistencies in Mona's version of what happened. "It was evident that there were glaring inconsistencies between her [Mona Brouchet's] trial testimony and the facts as she related them to the police in the statement that she gave a few days after this alleged occurrence." Defense counsel spoke to the jury of Mona's not being honest in her testimony or in the statements that she had given to the police. Defense counsel noted, too, in his closing remarks that Mona Brouchet was obviously trying to hide something.
It can hardly be that the jury was not aware that Mona Brouchet was deceptive in a number of respects in the course of her trial testimony. Even so, they found Humphrey guilty of two counts of manslaughter in connection with the beating deaths of his two infant daughters. Additional evidence of Mona Brouchet's inconsistency and deception would hardly have prompted the jury to conclude otherwise.
The trial judge in denying the defendant's motion for a new trial reasoned: Polygraph information is inadmissible at criminal trials and therefore could not have directly affected the jury's verdict. Given the unreliability of the examination itself, the trial court stated that the polygraph examination could not be equated to actual fact. James Humphrey testified on his own behalf at trial so that the jury was able to judge his credibility for themselves. Additionally, Mona Brouchet had also testified at trial as a state witness and was thoroughly cross-examined by defense counsel, so as to enable the jury to determine her credibility as well. The jury also had evidence before them which corroborated portions of Mona Brouchet's testimony concerning the time of her leaving and returning home and the well-being of the children when she left. The court concluded that "nothing can be added by granting a new trial in this particular case."
We agree with the trial judge's assessment. He did not abuse his discretion in concluding that the defendant had not shown grounds for his being granted a motion for a new trial under La.C.Cr.P. art. 851(3) and (4).
For the foregoing reasons, we find defendant's assignment of error number one non-meritorious.

ASSIGNMENT OF ERROR NUMBER TWO
By this assignment of error defendant contends that the trial court erred in sentencing the defendant to fifteen years at hard labor on each count of manslaughter to be served consecutively. Defendant argues that the sentence was excessive and violated defendant's constitutional right as guaranteed by La. Const. art. 1, § 20.
This case, of course, was remanded by this Court to the trial court for resentencing. Therefore, the trial court was very careful in stating its reasons for the record and in considering the factors in La.C.Cr.P. art. 894.1. The trial court considered the defendant's prior record. The trial court then very carefully discussed the factors listed in the codal article before stating his *1165 conclusion as to sentencing. Only at that point did the trial court sentence defendant to fifteen years at hard labor on each count, giving him credit for time already served. The terms were to run consecutively.
This Court in State v. Smith, 437 So.2d 252 (La.1983), stated the general law in this area:
La. Const. art. 1 § 20 prohibits the imposition by law of excessive punishment. Accordingly, we have held that imposition of a sentence, although within the statutory limit, may violate a defendant's constitutional rights against excessive punishment that is enforceable by this court on appellate review. The trial judge's reasons in imposing sentence, as required by La.C.Cr.P. art. 894.1, are an important aid to this Court when called upon to exercise its constitutional function to review a sentence complained of as excessive. Moreover, the trial judge is given a wide discretion in the imposition of sentences within statutory limits, and the sentence imposed by him should not be set aside as excessive in the absence of a manifest abuse of his discretion. State v. Washington, 414 So.2d 313 (La.1982).
Maximum sentences of twenty-one years for manslaughter have been upheld by this Court. See State v. Smith, supra; State v. Crawford, 410 So.2d 1076 (La.1982). In Crawford, this Court upheld a twenty-one year sentence of a mother found guilty of the manslaughter of her nine-month-old baby girl. While each case must be considered on its own facts,[9] the facts of this case show an even more heinous crime in which defendant killed his two infant children.
Defense counsel argues that although sentence was imposed on two counts since two deaths resulted, the maximum sentence should have been only twenty-one years, the maximum sentence for one count of manslaughter, considering the age of the children, their having no husbands or children dependent upon them, their apparent lack of long-term conscious suffering prior to death and defendant's knowledge that charges against their mother were dropped. This argument does not have merit. On review of the excessiveness claims, the only question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. State v. Williams, 412 So.2d 1327 (La.1982). Counsel has shown no abuse of discretion here.
This assignment of error lacks merit.

Decree
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
LEMMON, J., concurs.
NOTES
[1] The rehearing opinion notes that the remand ordered in the original opinion was not affected by the granting of a rehearing on another issue. There were, however, three dissents to the rehearing opinion. Also see 431 So.2d 751 (La. 1982).
[2] La.C.Cr.P. art. 851 reads in full:

The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and the evidence;
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence has been introduced at the trial it would probably have changed the verdict or judgment of guilty;
(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment; or
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
[3] The guidelines set forth by the trial judge in State v. Catanese, 368 So.2d 975 at 976, note 1 (La.1979), are the following:

I. A competent examiner....
II. A calibrated machine.
III. A subject relaxed to the extent that the test is valid....
IV. A competent pre-test interview....
V. A meaningful area of inquiry involved....
VI. One question, at least, that threatens the well-being of the subject...
VII. At least one control question in the technique....
VIII. Short answers. (preferably `yes' or `no').
IX. A low-key, quiet approach by the examiner throughout.
X. At least two charts with proper labeling and responses...
XI. The charts made available to the other side sufficiently in advance of the trial....
[4] In Catanese, we noted at 368 So.2d 981, 982:

The principal reasons for exclusion [of the results of the polygraph examination at trial] are interrelated: (1) Our fundamental concern is that the trier of fact is apt to give almost conclusive weight to the polygraph expert's opinion.... Our own appellate experience with P.E.I. tests and other scientific evidence reflects a concern over the apparent readiness of both juries and trial judges to accept such evidence uncritically. See State v. Graham, 360 So.2d 853 (La.1978); State v. Monroe, 345 So.2d 1185 (La.1977); State v. Jones, 316 So.2d 100 (La.1975). (2) Because of the potentially decisive character of polygraph evidence, we are equally concerned about the quality of such evidence available in Louisiana. The polygraph technique is capable of a high degree of accuracy only when conducted under controlled conditions by an examiner who is highly qualified by his ability, experience, education and integrity. At present Louisiana has no law providing for the licensing, regulating and disciplining of polygraph operators.... Thus, introduction of polygraph evidence in criminal trials would entrust key participation in the fact-finding process to persons not presently subject to effective judicial, legislative or adversary control. (3) Even if litigants were afforded an adequate supply of highly qualified experts, extensive procedural safeguards should be established either by court rule or legislation before the introduction of polygraph tests at trial. Otherwise, there is apt to be either an inadequate check upon the quality of the evidence or an undue consumption of time involved in its introduction.
[5] La.C.Cr.P. art. 729.3 provides:

If, subsequent to compliance with an order issued pursuant to this Chapter and prior to or during trial, a party discovers additional evidence or decided to use additional evidence and such evidence is or may be, subject to discovery or inspection under the order issued, he shall promptly notify the other party and the court of the existence of the additional evidence, so that the court may modify its previous order or allow the other party to make an appropriate motion for additional discovery or inspection.
[6] Humphrey's charts were allegedly tendered as proffered evidence at the time the motion for a new trial was initially made (before the appeal and the remand by this Court to the district court to consider the polygraph information before deciding anew the motion for a new trial). However, at the hearing on remand, the polygraph evidence of Humphrey's examination could not be located and so the trial judge had only the testimony of the expert witnesses and the charts and report on the Brouchet examination on which to rely in making his decision.
[7] In State v. Roussel, 381 So.2d 796 (La.1980), the alleged Brady information was admitted by the victim at trial. [The information was that the victim of the alleged rape was an ex-heroin addict who had served five years in a Texas jail for heroin possession and who, on the night of the alleged rape, was undergoing methadone treatment and had smoked a marijuana cigarette with her alleged attacker shortly before the rape.]
[8] The girls died as a result of violent injuries. These injuries in the opinion of the deputy coroner who testified at the trial required muscular strength. Latasha's head injuries were the probable cause of her death. Janice died of neurogenic shock from brain stem and spinal cord injuries resulting from a fracture by twisting of one of the neck vertebra.
[9] This Court has consistently affirmed sentences for manslaughter, whatever their length: see, e.g., State v. Tompkins, 429 So.2d 1385 (La. 1982) (fifteen years); State v. Roussel, 424 So.2d 226 (La.1982) (twenty-one years); State v. Allen, 416 So.2d 553 (La.1982) (twelve years); State v. Simmons, 414 So.2d 705 (La.1982) (six years); State v. Brown, 412 So.2d 998 (La.1982) (ten years); State v. Campbell, 404 So.2d 1205 (La. 1981) (twenty years); State v. McMahon, 391 So. 2d 1120 (La.1980) (fifteen years); State v. Stegall, 377 So.2d 103 (La.1979) (twenty years); State v. Romero, 369 So.2d 1342 (La.1979) (fourteen years); State v. Gomez, 365 So.2d 1313 (La. 1978) (five years).