**STATE OF LOUISIANA**       *       NO. 2019-KA-0467

**VERSUS**       *

       **COURT OF APPEAL**

**KYRON A. THEOPHILE**       *

       **FOURTH CIRCUIT**

       *

       **STATE OF LOUISIANA**

       * * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 528-690, SECTION "G"
Honorable Dennis J. Waldron, Judge
* * * * * *
**Judge Roland L. Belsome**
* * * * * *
(Court composed of Judge Roland L. Belsome, Judge Sandra Cabrina Jenkins,
Judge Regina Bartholomew-Woods)

Leon Cannizzaro
District Attorney
Donna Andrieu
Irena Zajickova
Assistant District Attorney
Orleans Parish
619 S. White Street
New Orleans, LA 70119


       COUNSEL FOR STATE OF LOUISIANA/APPELLEE


Meghan Harwell Bitoun
Louisiana Appellate Project
P. O. Box 4252
New Orleans, LA 70178


       COUNSEL FOR DEFENDANT/APPELLANT


       **AFFIRMED**

       **DECEMBER 11, 2019**

This appeal challenges Defendant Kyron Theophile's mandated life sentence imposed after the trial court found him to be a third felony offender with three crimes of violence.

## *Procedural History*

On July 25, 2016, Defendant pleaded guilty to domestic abuse battery involving strangulation in exchange for a sentence of three years. The trial court accepted Defendant's guilty plea and agreed, because Defendant's loved one was expecting to give birth on or about September 3, 2016, to postpone sentencing Defendant until September 12, 2016. However, the trial court warned that there would be dire consequences should Defendant fail to appear for sentencing. The trial court informed Defendant that a capias would be ordered for Defendant's arrest and he would face the prospect of having the State file a multiple bill against him.

On September 12, 2016, Defendant failed to appear for sentencing and the trial court continued the matter until September 19, 2016, again warning that Defendant's failure to appear on that date would result in the issuance of a capias

for his arrest and a recommendation to the State "that they proceed with a multiple bill proceeding."

Defendant once again failed to appear for court on September 19, 2016. In response, the trial court issued a capias for his arrest and the State announced that Defendant was "eligible for a multiple bill." In an unrelated matter, during the time period in which Defendant failed to appear for sentencing, a warrant was issued for his arrest on a seperate charge of second-degree murder.

Defendant was arrested on December 23, 2016, on the trial court's capias, as well as, on the second degree murder warrant. On March 14, 2017, Defendant appeared for sentencing and the trial court sentenced Defendant to three years incarceration in accordance with the original plea agreement. Despite Defendant's failure to appear in court on September 12, 2016, and later, on September 19, 2016, the prosecution, at that point, agreed not to charge Defendant as a recidivist.

On September 13, 2017, the State filed a multiple bill of information alleging that Defendant was a quadruple felony offender. A multiple bill hearing was conducted. At the hearing, the prosecutor stated that at the time he agreed not to multiple bill Defendant, back on March 14, 2017, he "was unaware that [Defendant] had a pending murder charge." Specifically, the prosecutor explained:

> So Mr. Theophile, you attempted a plea agreement of no-bill and [three] years. I was unaware that you had been arrested for murder with a murder charge and it's currently pending in Section "F". The State alleg[es] that that's a breach of our plea agreement and therefore, I'm filing a multiple bill against you.

Thereafter, Defendant filed a motion to quash the multiple bill; after a hearing, the trial court denied the motion. Defendant's writ application was denied by this Court. *State v. Theophile*, 2018-0679 (La. App. 4 Cir. 9/14/18) *unpub'd*. Following this Court's ruling, a multiple bill hearing was scheduled to proceed on

October 15, 2018.  At the multiple bill hearing, there was a delay in proceedings due to Defendant's consultation with his attorney about whether to accept a plea deal offered by the State.  The State explained that the proposed plea agreement would be that Defendant plead guilty to being a quadruple offender and in exchange he would receive a sentence of twenty-five years and that plea would be conditioned on Defendant also entering a plea to twenty-five years on the charges pending in Section "F".  The State explained:

> THE STATE:
> And to be clear, Judge.  The sentence would be 25 years as a multiple offender…. [T]his plea is conditioned on him entering the same plea in all of his other cases in Section "F" to run concurrently.
>
> THE COURT:
> Those are the new charges that the gentleman has?
>
> THE STATE:
> [H]is homicide….
>
> THE COURT:
> But he would receive a 25 year sentence there because you would reduce it to manslaughter?
>
> THE STATE:
> Correct.  That is the conditions of the State's plea.

Defendant ultimately accepted the conditions of the aforementioned plea agreement.  The trial court then informed Defendant that by pleading guilty he was waiving his right to proceed to trial and all the privileges associated therewith, such as the right to remain silent and the right to have the State prove that he was the same person convicted of the prior offenses.  The trial court specifically noted that in pleading guilty, Defendant was also agreeing to plead guilty to a manslaughter charge in Section "F," which would include a concurrent sentence of twenty-five years.

Next, the trial court reviewed the convictions that comprised the multiple bill to which defendant was pleading guilty: 1) 528-690 - domestic abuse battery involving strangulation; 2) 512-702 - possession of contraband in a penal institution; 3) 479-964 - aggravated assault with a firearm; 4) 449-707 - possession of heroin. Thereafter, the plea of guilty to the multiple bill was signed by Defendant, his attorney and the judge. The trial court sentenced Defendant to a term of twenty-five years in the care and custody of the Department of Corrections as a fourth offender pursuant to La. R. S. 15:529.1.

On October 31, 2018, the State filed a multiple bill against Defendant, seeking a life sentence. That multiple bill was prompted by Defendant's refusal to plead guilty to the charge of manslaughter in Section "F", thereby reneging on the October 15, 2018 twenty-five-year plea agreement. The new multiple bill charged that Defendant pled guilty to the following offenses: 1) 528-690 - domestic abuse battery involving strangulation; 2) 479-694 - aggravated assault with a firearm; 3) 449-707 - aggravated assault with a firearm.

During the October 31, 2018 multiple bill proceeding, the trial court asked Defendant if he was still interested in trying to obtain a twenty-five-year plea deal. Defendant refused to respond to the inquiry, instead he sought a fifteen-day delay to object to the multiple bill filed against him by filing a motion to quash. The trial court granted Defendant the fifteen-day delay, resetting the matter for hearing on November 19, 2018.

In Defendant's motion to quash the multiple bill, he claimed that the State was using the new multiple bill as selective enforcement to have Defendant plead guilty to the pending murder charge. The State responded by describing Defendant as "extremely violent" and went through several violent crimes that Defendant had

4

committed, including pulling a gun and pointing it at a police officer, firing a gun at an unarmed individual, and attempting to strangle his girlfriend. Further, the State noted that Defendant had recently been convicted of stealing his girlfriend's car, he displayed defiance in refusing to allow his fingerprints to be taken, and he was under investigation for smuggling drugs into the Orleans Parish jail.

After hearing arguments from both sides, the trial court denied Defendant's motion to quash and vacated the October 15, 2018 twenty-five-year sentence. The court then reviewed Defendant's prior actions that had precipitated the court's order vacating the twenty-five-year sentence.

> [T]he Court notes for the record that the Defendant stood before this Court and he indicated that he would enter a plea of guilty to the multiple bill that would not expose him to life imprisonment and that … [a] multiple bill of information was duly filed and the sentence that was agreed to would be twenty five years.
> There was a condition attached thereto, the condition was his plea of guilty would also be entered in the days that followed … before her, Honor Judge Robin Pittman [Section "F"] for the crime of manslaughter…. It was further agreed that his sentence there would run concurrently with the twenty-five-year sentence that this Court imposed.
> Upon this Court's return for the second appointment as the Ad Hoc Judge here … the Court was formally notified by all parties that … Mr. Theophile had not carried through on the commitment that he had made and that this additional proceeding would indeed be necessary from the State's prospective.

Thereafter, Defendant cooperated in having his fingerprints taken. The trial court then recessed the matter until the following day, allowing time for a fingerprint analysis to be performed. On November 20, 2018, the multiple bill hearing continued with Officer Joseph Pollard, an expert in fingerprint identification, offering testimony. Officer Pollard compared the fingerprints taken from Defendant the previous day with the fingerprints taken in case numbers 449-707 and 479-694, the two aggravated assault with a firearm convictions. Officer

5

Pollard concluded that, based on the fingerprints, Defendant was the same person who pled guilty to the charges of aggravated assault with a firearm in case numbers 449-707 and 479-694. Further, Officer Pollard testified that the prints he examined, belonging to Defendant, also matched the prints taken in connection with Defendant's guilty plea in case number 528-690 on the charge of domestic abuse battery involving strangulation.

After it was established that Defendant was the same person who had been convicted on two separate charges of aggravated assault with a firearm and domestic abuse battery involving strangulation, the trial court went through the history of the case noting that Defendant faced a life sentence because his earlier, twenty-five-year sentence "has now been rescinded when the gentleman did not follow through and also entered [sic] a plea of guilty before Your Honor Judge Pittman for the crime of manslaughter…." Thereafter, Defendant argued that domestic abuse battery involving strangulation is not an enumerated crime of violence under La. R.S. 14:2(B) and therefore, should not be considered a crime of violence for purposes of La. R.S. 15:529.1. The trial court noted Defendant's argument, but rejected it.

In support of its ruling, the trial court first examined the definition of "crime of violence," as set forth in La. R.S. 14:2(B), and how domestic abuse battery involving strangulation fits that definition. The trial court also pointed to La. R.S. 14:35.3 wherein the legislature elevated the crime of domestic abuse battery involving strangulation to a felony subject to imprisonment at hard labor for not more than three years. The court concluded:

> Thus, the Court maintains its ruling finding that the intention of the legislature and acting in that way both in its general definition of a crime of violence in Revised Statute 14:2(B) and its specific

6

distinction and elevation, if you will, of the crime of domestic abuse battery from a misdemeanor to a three year felony when the domestic abuse battery involves strangulation that clearly, clearly in my mind that is evidence of the legislature's intent to include such as a crime of violence....

Thereafter, the trial court, having earlier vacated Defendant's twenty-five-year sentence, proceeded to find Defendant to be a third felony offender with three crimes of violence, mandating a sentence of life imprisonment. The trial court then continued the matter, deferring a ruling on Defendant's motion for a downward departure.

At a November 27, 2018 hearing, the trial court once again reviewed the lengthy history of this case and reiterated its reasoning as to why it found Defendant's conviction for the crime of domestic abuse battery involving strangulation to be a crime of violence, thereby supporting a finding that Defendant had thrice been convicted of crimes of violence. Thereafter, the trial court considered whether Defendant would be subjected to an excessive sentence, reviewed applicable jurisprudence, and examined Defendant's lengthy criminal history. Ultimately, the trial court concluded that it was unable to find anything "redeeming" in Defendant's life and sentenced him "to the mandated sentence of life imprisonment … without benefit of parole, probation or suspension of sentence." This appeal followed.

### *Assignments of Error*

On appeal, Defendant challenges the legality of his life sentence by contending that: 1) the multiple bill filed on October 31, 2018, was not properly before the trial court; 2) La. R.S. 15:529.1 did not mandate a life sentence under these circumstances; and 3) the sentence of life is unconstitutionally excessive.

## Multiple Bill

Defendant sets forth numerous arguments in support of the contention that the life sentence imposed pursuant to the October 31, 2018 multiple bill was illegal. First, Defendant maintains that once the trial court sentenced him to twenty-five years, pursuant to his plea of guilty to the October 15, 2018 multiple offender bill of information charging him as a quadruple offender, the State had no authority to file a second multiple bill of information against him. In support of this argument, Defendant cites *State v. Stott*, 395 So.2d 714 (La. 1981), In *Stott,* the Supreme Court stated that had the trial court imposed a sentence after finding that the defendant was not a multiple offender, the court "might" have been precluded from later adjudicating the defendant to be a multiple offender. *Id* at 718.

Defendant's reliance on *Stott* is problematic. Most importantly, in *State v. Quinn,* 09-1382, p. 9 (La. App. 3 Cir. 5/12/10), 38 So.3d 1102, 1108, the court noted that the *Stott* court was dealing with a situation where the second multiple bill was identical to the initial multiple bill and, in such a case, the actual imposition of an enhanced sentence may have precluded the second multiple bill. However, that is not the case in the instant matter. In this case, the multiple bill that Defendant is challenging was not identical to the quadruple multiple bill that led to the imposition of a twenty-five-year sentence. Further, in neither *Stott, supra,* nor *Quinn, supra,* were the courts dealing with a situation where a modification of the initial multiple bill was necessitated by the defendant's violation of the explicit terms of the earlier plea bargain.

Defendant next challenges his life sentence on the basis that he entered into a binding plea agreement on October 15, 2018, which was signed by himself, his

counsel, and the trial judge. According to Defendant, the State should have challenged the validity of the plea agreement, via an appeal, rather than a second multiple bill. Defendant asserts that he was not aware of the condition that he was required to plead guilty to the charges pending in Section "F" to satisfy the terms of the plea agreement and further contends that he was not aware that his failure to do so would result in the imposition of a life sentence. Those assertions are not supported by the record.

In determining the validity of plea agreements:

Louisiana courts generally refer to rules of contract law, while recognizing at the same time that a criminal defendant's constitutional right to fairness may be broader than his or her rights under contract law. The first step under contract law is to determine whether a contract was formed in the first place through offer and acceptance. The party demanding performance of a contract has the burden of proving its existence. In the context of plea bargains, a defendant may demand specific performance of the state's promise if he can show that the parties reached an agreement, that he performed his part of the agreement, and that in doing so, he relinquished a fundamental right.

*State v. Givens*, 1999-3518, pp. 14-15 (La. 1/17/01), 776 So.2d 443, 455(citations omitted).

In this case, Defendant did not fulfill his part of the agreement in that Defendant was repeatedly informed, on the record, that he must plead guilty to the charges he was facing in Section "F" in order to receive the twenty-five-year sentence the State was offering. The State made this clear to Defendant and the trial court reiterated the requirement before accepting the plea of guilty.

Thus, Defendant's argument to the effect that the October 15, 2018 plea agreement was somehow unassailable absent an appeal because Defendant comported with all the requirements and was simply unaware that he was required to enter a plea of guilty in Section "F", is untrue. Defendant's action, in failing to

9

plead guilty in Section "F", rendered the October 15, 2018 plea agreement null and void. *See State v. Dixon*, 449 So.2d 463, 464 (La. 1984) (a plea agreement is constitutionally infirm when plea bargain is not kept); *see also State v. Perry*, 1995-0206, p. 6 (La. App. 3 Cir. 5/31/95), 657 So.2d 437, 440 (if defendant fails to enter into stipulation as required under plea agreement, then the entire plea agreement is null and void). As such, there was nothing preventing the State from filing a second multiple bill of information against Defendant.

Further, Defendant's claim that he was not aware that he would be facing a life sentence if he violated the terms of the twenty-five-year plea agreement is likewise inconsistent with the record. A review of the October 31, 2018 hearing transcript shows that once Defendant had been brought back to court for the second multiple bill hearing and thus, knew he was facing a life sentence, the trial court gave him the opportunity to keep his twenty-five-year plea deal. Defendant refused the trial court's offer. For these reasons, Defendant's claim that it was legally incorrect for the trial court to act on the second multiple bill is without merit.

## *Life Sentence*

Next, Defendant presents a two-fold argument insisting that a life sentence was not mandated under La. R.S. 15:529.1. First, Defendant asserts that because the crime of domestic abuse battery involving strangulation is not an enumerated crime of violence pursuant to La. R.S. 14:2(B), it could not be considered a crime of violence for purposes of imposing a life sentence pursuant to La. R.S. 15:529.1A(3)(b). Defendant also asserts that the trial court was not required, once it found Defendant to be a third felony offender guilty of three prior crimes of violence, to impose a life sentence.

10

Defendant is correct in that domestic abuse battery involving strangulation is not specifically enumerated as a crime of violence under La. R.S. 14:2(B). However, it is well established that the list of offenses under La. R.S. 14:2(B) "is illustrative, not exclusive." *State v. Kelly*, 52,731, p. 11 (La. App. 2 Cir. 6/26/19), 277 So.3d 855, 864 (citing *State v. Robinson,* 46,737 (La. App. 2 Cir. 12/14/11), 79 So.3d 1270). "Because the list of enumerated offenses is merely illustrative, unlisted offenses may be denominated as crimes of violence under the general definition of the term provided" under La. R.S. 14:2(B). *Id.* (citing *State v. Oliphant,* 12-1176 (La. 3/19/13), 113 So.3d 165). Further, as the court noted in *State v. Smith*, 45,430, p. 5 (La. App. 2 Cir. 8/11/10), 47 So.3d 553, 556, the recidivist statute provides for a mandatory life sentence of a third felony offender when each of defendant's crimes is defined as a crime of violence under La. R.S. 14:2(B)B; there is no requirement that each crime be enumerated as a crime of violence.

La. R.S. 14:2(B) provides, in pertinent part:

> In this Code, "crime of violence" means an offense that has, as an element, the use, attempted use, or threatened use of physical force against the person or property of another, and that, by its very nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense or an offense that involves the possession or use of a dangerous weapon.

Using the above definition as guidance, the trial court concluded that "domestic abuse battery involving strangulation is and was intended by the legislature to be designated as a crime of violence since **it is an offense that has [as] an element,**

11

**the use, attempted use or threatened use of physical force against the person.**"
(emphasis added).[1]

The trial court's conclusion in this regard is supported by a recent decision, *Kelly, supra,* wherein the defendant similarly argued that because domestic abuse battery involving strangulation was not enumerated in La. R.S. 14:2(B), it could not be considered a crime of violence. The court rejected defendant's argument, reasoning:

> Domestic abuse battery is the intentional use of force or violence committed by one household member or family member upon the person of another household member or family member. La. R.S. 14:35.3(A). "Strangulation" means intentionally impeding the normal breathing or circulation of the blood by applying pressure on the throat or neck or by blocking the nose or mouth of the victim. La. R.S. 14:35.3(B)(7). Based upon the definition provided in La. R.S. 14:2(B), we find that the trial court correctly considered Kelly's 2010 conviction [for domestic abuse battery by strangulation] as a crime of violence.

*Kelly*, 52, 731 at pp. 11-12, 277 So.3d 855 at 864.

Accordingly, because the crime of domestic abuse battery involving strangulation fits under the definition of "crime of violence" enunciated in La. R.S. 14:2(B), the trial court's determination that it was indeed a "crime of violence" was not erroneous despite the fact that the crime is not enumerated under the statute.

Defendant also argues that just as the trial court had discretion in determining whether or not domestic abuse battery involving strangulation was a crime of violence, it likewise had discretion as to whether or not to impose a life sentence under La. R.S. 15:529.1A(3)(b). In support, Defendant cites *State v.*

---

[1] The trial court also noted the legislature's elevation of the crime of domestic abuse battery involving strangulation to the ranks of felony offenses as an indication of the legislature's intent that it should be considered a crime of violence.

*Sims,* 2017-0101 (La. App. 4 Cir. 11/15/17), 231 So.3d 742, a case wherein Sims was convicted of the crimes of home invasion, aggravated battery, both enumerated crimes of violence under La. R.S. 14:2(B) and domestic abuse battery by strangulation. In that case, the trial court did not sentence Sims to a life sentence, which, according to Defendant, shows that the trial court had discretion in sentencing Sims and was not required to do as the trial court did in the instant case and impose a mandatory life sentence.

A comparison of the facts at issue in the instant case and the facts at issue in *Sims,* shows that the cases are distinguishable. While Sims was convicted at trial of three crimes, two enumerated as crimes of violence under La. R.S. 14:2(B) and one defined as a crime of violence under La. R.S. 14:2(B), crimes of violence did not serve as the basis of his multiple bill. Instead, his multiple bill charging him as a quadruple offender consisted of four crimes none of which were enumerated or defined as crimes of violence under La. R.S. 14:2(B).[2] Thus, the *Sims* trial court, unlike the judge in the instant case, was not presented with applying 15:529.1A(3)(b), which provides that where a third felony and two prior felonies charged in the multiple bill are defined as crimes of violence under La. R.S. 14:2(B), the person shall be incarcerated to a term of life imprisonment. Contrary to Defendant's suggestion, it was not left to the trial court's discretion - a life sentence was indeed mandated.

## *Excessive Sentence*

In his final argument, Defendant asserts that his life sentence is constitutionally excessive. The standard for review of a claim that a mandatory

---

[2] The crimes which served as Sims' predicate offenses were: A conviction for unauthorized entry of an inhabited dwelling and three convictions for illegal possession of a stolen automobile worth over $500.

sentence imposed under La. R.S. 15:529.1 is excessive is well-settled and was set forth by this Court on appeal in *State v. Hall*, 2010-1516 (La. App. 4 Cir. 4/18/11), 64 So.3d 339. This Court stated:

> Even though a sentence under the Habitual Offender Law is the minimum provided by that statute, the sentence may still be unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, or is nothing more than the purposeful imposition of pain and suffering and is grossly out of proportion to the severity of the crime. However, the entire Habitual Offender Law has been held constitutional, and, thus, the minimum sentences it imposes upon habitual offenders are also presumed to be constitutional. There must be substantial evidence to rebut the presumption of constitutionality. To rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must show by clear and convincing evidence that he is exceptional, which in this context means that because of unusual circumstances he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. "Departures downward from the minimum sentence under the Habitual Offender Law should occur only in rare situations."

*Hall*, 2010-1516, pp. 3-4, 64 So.3d at 341-42 (quoting *State v. Rice*, 2001-0215, pp. 5–6 (La. App. 4 Cir. 1/16/02), 807 So.2d 350, 354) (citations omitted).

"The trial judge is vested with broad discretion in sentencing, because the trial court is in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Wilson*, 2001-2815, pp. 3-4 (La. 11/22/02), 836 So. 2d 2, 4 (citing *State v. Cook*, 1995-2784 (La. 5/31/96), 674 So.2d 957). Thus, on appellate review of a sentence, the only relevant question is "'whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.'" *Cook*, 1995-2784 at p. 3, 674 So.2d at 959 (quoting *State v. Humphrey*, 445 So.2d 1155, 1165 (La.1984)).

"'For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, *i.e.*, when it imposes punishment disproportionate to the offense.'" *State v. Soraparu*, 97-1027 (La. 10/13/97), 703 So. 2d 608 (quoting *State v. Sepulvado*, 367 So.2d 762, 767 (La. 1979)).

In an effort to show that he is "exceptional," Defendant points to the fact that, in connection with his domestic abuse battery by strangulation conviction, he was originally sentenced to the maximum sentence of three years and that the sentencing judge "recommended Mr. Theophile to any and all Department of Corrections self-help, vocational, and other certification programs, indicating a recognition of Mr. Theophile's capacity for rehabilitation." The trial court, however, made these remarks without the benefit of knowing Defendant's extensive criminal history. At the time of defendant's original sentencing, the State had not filed a multiple bill against defendant.

Defendant also suggests that the trial court imposed a life sentence "in reaction to allegations by the State that Mr. Theophile committed second degree murder in a case charged in Section 'F'." While the trial court did note that defendant was facing trial on a charge of second degree murder, that was just one factor of many that the trial ourt took into account.

The trial court, before sentencing Defendant, performed a thorough review of its responsibility to ensure that the imposed sentence was not unconstitutionally excessive. The trial court specifically reviewed the Louisiana Supreme Court's decisions in *State v. Sepulvado*, 367 So.2d 762 (La 1979) and *State v. Dorthey,* 623 So.2d 1276 (La. 1993), noting that neither case involved crimes of violence. The trial court also examined controlling precedent enunciated in *State v. Green*, 2016-

0107 (La. 6/29/17), 225 So.3d 1033, wherein the Court provided "that the trial court must find clear and convincing evidence of exceptional circumstances to deviate from an otherwise mandated sentence."

Following an examination of law, the trial court then examined Defendant's criminal history. The trial court noted that Defendant, between the years 2004 and 2016, pled guilty to the crimes of possession of cocaine, possession of heroin, and most importantly, to aggravated assault with a firearm. In 2009, Defendant pled guilty to being a felon attempting to possess a firearm and, once again, pled guilty to aggravated assault with a firearm. Thereafter, in 2016, Defendant pleaded guilty to the crimes of simple assault, domestic abuse battery, and domestic abuse battery involving strangulation.

The court also noted the following convictions that were enumerated in the State's sentencing memorandum.

> In 512-702 of Section "C" of this Criminal District Court for possession of contraband within a penal institution[;] in 507-452 of Section "C" of this Criminal District Court [for] possession of contraband within a penal institution.

> In 440-103 of Section "I" of this Criminal District Court [for] possession of cocaine.

> In 449-780 of Section "K" of this Criminal District Court [for] resisting an officer and illegal carry of an [sic] weapon.

The trial court further examined how Defendant had gotten to the situation he was facing, how Defendant had failed to appear for sentencing when he said he would, and how he had failed to plead guilty to the Section "F" charges when he said he would, despite the fact that he knew what would happen if he did not follow through.

16

Thereafter, the trial court specifically stated that it had reviewed the sentencing guidelines for anything that would allow it to depart from the life sentence mandated by the Louisiana Legislature. However, based on Defendant's extensive criminal history, along with his pattern of behavior that led to Defendant facing a mandatory life sentence, the court determined that Defendant had failed to show that he was "exceptional," and that he warranted a downward departure. Accordingly, the trial court concluded: "I thus, without reservation; Sentence you without any deviation to the mandated sentence of life imprisonment [for] the balance of your natural life, as it's spelled out in the Code without the benefit of parole, probation, or suspension of sentence."

On review of the record and the trial court's well documented reasons, this Court cannot find that Defendant warranted a departure from the statutory guidelines on sentencing.

### *Conclusion*

For the reasons discussed, Kyron Theophile's sentence is affirmed.

**AFFIRMED**

17