STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

05-633

STATE OF LOUISIANA

VERSUS

BILLY RAY ROBINSON

************

APPEAL FROM THE
TWENTY-EIGHTH JUDICIAL DISTRICT COURT,
PARISH OF LASALLE, NO. 72,511,
HONORABLE J. P. MAUFFRAY, JR., DISTRICT JUDGE

************

MICHAEL G. SULLIVAN
JUDGE

************

Court composed of Sylvia R. Cooks, Michael G. Sullivan, and James T. Genovese,
Judges.

**AFFIRMED.**

J. Reed Walters
District Attorney
Post Office Box 1940
Jena, Louisiana  71342
(318) 992-8282
Counsel for:
        State of Louisiana

W. Jarred Franklin
Louisiana Appellate Project
3001 Old Minden Road
Bossier City, Louisiana  71112
(318) 746-7467
Counsel for Defendant/Appellant:
        Billy Ray Robinson

SULLIVAN, Judge.

At approximately 12:15 p.m. on July 23, 2003, an armed man robbed Homeland Bank in Jena, Louisiana. Following an investigation conducted by the LaSalle Parish Sheriff's Department, Billy Ray Robinson was arrested and indicted for armed robbery, a violation of La.R.S. 14:64. After hearing evidence on June 30, 2004, a jury found Defendant guilty as charged. Defendant filed a Motion for New Trial, which was denied by the trial court.

On February 8, 2005, Defendant was sentenced to serve forty years at hard labor without benefit of probation, parole, or suspension of sentence. Defense counsel objected to the sentence as excessive and informed the court of his intent to appeal. An appeal was granted on February 24, 2005.

Defendant appeals, asserting two assignments of errors: 1) insufficiency of the evidence and 2) the sentence imposed is excessive.

## Errors Patent

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. No patent errors were found by our review of the record.

## Sufficiency of the Evidence

Defendant contends the evidence was insufficient to support the jury's verdict, arguing the evidence does not exclude the possibility that his brother, Eddie Robinson, committed the robbery.

### Standard of Review

When reviewing the sufficiency of the evidence, appellate courts are controlled by the standard announced in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). On appeal, courts must determine whether "the evidence, viewed in the light

most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La.1984). Where an essential element of a crime is sought to be proven by circumstantial evidence, "it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438.

> [B]efore a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised[,] and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

*State v. Chism*, 436 So.2d 464, 469 (La.1983).

The fact finder is given much discretion in making determinations of credibility and evidence, and appellate courts are not required to determine whether witnesses are believable or the evidence establishes guilt beyond a reasonable doubt. *State v. Mussall*, 523 So.2d 1305 (La.1988). Appellate courts will "impinge[] upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789.

***The Evidence***

Laura Willis, one of the two bank tellers on duty when the robbery occurred, described the robber as a black male with white beads in the bottom of his hair. She stated he was five foot six inches to five foot seven inches tall and wore a white polo-type shirt with a pink ring around the collar and jeans. Ms. Willis could not

2

positively identify the robber because he wore a stocking pulled down over his head and his face just below his nose.

Jana Hudson, Ms. Willis' co-worker, described the robber as a black male with a stocky build and thick neck who had braids in his hair with beads at the ends. She testified that the robber wore a white polo-style shirt with a pink stripe on the collar, jeans, tennis shoes, and a black mask. Ms. Hudson also could not positively identify the robber because of the mask he wore.

Jimmy Arbogast, an investigator with the LaSalle Parish Sheriff's Office, investigated the robbery. He interviewed Ms. Willis and Ms. Hudson to determine the amount of money taken and to get a description of the robber. The bank provided him a list of "bait money" taken in the robbery. Bait money is a strap of five hundred dollars of twenty dollar bills kept in each teller's drawer. The bills are photocopied, and the serial number of each bill is recorded, so the money can be tracked if the bank is robbed.

Amanda Smith, accounting manager at the Jena Wal-Mart, testified that on July 24, 2003, she was alerted by a co-employee that someone matching the description of the bank robber was in Wal-Mart. Ms. Smith went to the location identified by her co-employee and followed Eddie Robinson, Defendant's brother, around the store. She notified the LaSalle Parish Sheriff's Department that the bank robber might be present in the store.

Mr. Arbogast went to Wal-Mart. He matched the serial numbers on money Eddie spent at Wal-Mart to serial numbers of some of the bait money taken from Homeland Bank. Mr. Arbogast was also given three bills spent on July 23, 2003, that matched the serial numbers of the bait money. According to Ms. Smith, the three

3

bills spent on July 23, 2003, were taken from one of the store's front registers. There was no evidence to show what time the money was spent on July 23, 2003.

Eddie was detained and questioned by police. Subsequently, police searched the residence where he was living. Photographs of Defendant and Eddie, along with a Wal-Mart receipt dated July 23, 2003, at 1:41 p.m., were seized from the residence. Mr. Arbogast testified that as a result of the photographs, Defendant was added as a suspect because Defendant's hair in the photograph taken from the residence matched the robber's hair in photographs taken from bank cameras during the robbery. The receipt was introduced as evidence at the trial, but the photographs were not.

Eddie testified that he was at home on July 23, 2003, between 12:00 and 1:00 p.m. and that he went to the neighbor's house between 11:30 a.m. and 12:00 p.m. to borrow a hammer. He later agreed that he went to the neighbor's house between 11:00 and 11:30 a.m. and testified that he was there for fifteen to twenty minutes. Eddie further testified that he paid for the purchase he made on July 24, 2003, with money Defendant had given him the day before "around twelve." He testified that he had been convicted of armed robbery in 1988 but denied being involved in the robbery of the Homeland Bank.

Eddie lived with his mother and her boyfriend, Leslie Wilson. Mr. Wilson testified that he went to the Bank of Jena on July 23, 2003, to cash his social security check and returned home at approximately 10:00 a.m. He further testified that Eddie was home when he returned and that Eddie did not leave home all day, except to borrow a hammer from the neighbor.

Mr. Wilson testified that he contacted Defendant "around twelve" on July 23, 2003, and asked Defendant to take him to Wal-Mart. Mr. Wilson testified that he

4

made some purchases and that Defendant got a photograph enlarged while they were at Wal-Mart. Mr. Wilson did not recall what time he talked to Defendant or what time Defendant picked him up, testifying "I have no direct recollection of the particular time. But, we left from my residence to go to Wal-Mart between twelve and I say, one o'clock."

Cheryl Breland, the electronics department manager for Wal-Mart, testified that she was working in the electronics department on July 23, 2003, and assisted a black male enlarging a photograph. While assisting the man, she indicated to him that she recognized him from somewhere, and he explained that she recognized him from Popeye's where he worked. Ms. Breland identified Defendant as the man she assisted. She testified that he wore black pants, a dingy white shirt, and black shoes, one of which had a hole in it. She further testified that he had dread locks in his hair with "white on the ends of 'em." Ms. Breland stated that Defendant bought a C.D., a calendar, a pair of shoes, two photograph reprints, and possibly a shirt and that he paid for his purchase with twenty dollar bills. She further testified that shortly after she assisted Defendant, Ms. Smith pulled the twenty dollar bills he gave her from her register. Ms. Breland testified that the purchase reflected on the receipt seized from Eddie's residence was not made at her register.

Mr. Arbogast interviewed Defendant after his arrest. Defendant denied going to Wal-Mart on July 23, 2003, and spending money there; he was unable to say where he was at the time of the robbery. He told Mr. Arbogast that he got the money he had from his employer. Mr. Arbogast did not verify this information. Mr. Arbogast searched Defendant's residence but did not find any evidence linking Defendant to the robbery.

5

Michael Marcum, Jr., a loss prevention employee of Wal-Mart, reviewed the Jena store security videotapes of July 23 and 24, 2003, and compiled relevant portions on one videotape. He reviewed the tapes based on logs maintained by the person in charge of changing the tapes. Mr. Marcum explained the process he followed to determine the date and time of the excerpts depicted on the tape he prepared. Mr. Marcum testified that a portion of the tape, which depicted a black male in the store, was taped on July 23, 2003, at approximately 1:13 or 1:14 p.m. He further testified that a portion of the videotape, which shows a black male making a purchase, was from July 24, 2003. The videotape was shown to the jury without any testimony identifying the men depicted on the videotape.

The State also introduced a series of nine photographs of the bank robbery, which depict a black male with white beads at the back of his hair robbing Homeland Bank. The pictures are not clear and would not allow the jury to compare the person depicted in those photographs to Defendant.

Defendant points out that neither teller could identify the person who robbed the Homeland Bank and that the only distinguishing characteristic cited by both tellers was the hairstyle of the offender. He contends there was no evidence presented regarding Eddie Robinson's hairstyle and there was no evidence to "contradict the hypothesis that Eddie wore 'corn rolls' as described by the tellers." He also asserts the possibility that another person committed the crime, which hypothesis is bolstered by the fact that a Wal-Mart employee believed Eddie might have been the robber based on the description provided by police. Defendant points out that the only evidence from the robbery was located at Eddie's residence. Additionally, he observes that the bait money seized from Wal-Mart was not fingerprinted and that no

6

witness connected him to the bait money seized at Wal-Mart. Lastly, he contends the videotape played at trial did not conclusively establish the date and time of the footage and was a compiled and edited copy of original tapes.

The State argues that the videotape from Wal-Mart shows Defendant entering the store with corn rows in his hair. It points to Mr. Wilson's testimony that Defendant took him to Wal-Mart the day of the robbery and that they left his home between 12:00 and 1:00 p.m. Further, it notes that Ms. Breland testified Defendant spent money in Wal-Mart "which money was later identified as 'bait money.'" The State contends this purchase was made one to one and one-half hours after the robbery. The State also contends that, based on Eddie's and Mr. Wilson's testimony, Eddie was excluded as the robber. Moreover, Eddie testified that he got the money he spent on July 24, 2003, from Defendant on July 23, 2003. The State asserts that Eddie's credibility was bolstered by Defendant's denial to Mr. Arbogast that he went to Wal-Mart on July 23, 2003, and spent money while there. The State additionally cites the testimony of Ms. Breland, asserting that her description of the Defendant's shirt matched that given by the bank tellers.

The jury could have reasonably inferred from the evidence that the State proved beyond a reasonable doubt that Defendant was the robber. The jury had the opportunity to judge Mr. Wilson and Eddie's credibility with regard to Eddie's whereabouts at the time the bank was robbed. Importantly, it had the opportunity to hear Eddie's testimony that he got the bait money he spent at Wal-Mart from Defendant the day of the robbery. The jury also had the opportunity to view Wal-Mart's security tape excerpts prepared by Mr. Marcum and determine whether Defendant was at Wal-Mart the day of the robbery or not.

7

Defendant argues the tape should not have been allowed into evidence because the dates and times of the excerpts and the method of preparation of the tape did not assure the accuracy of Mr. Marcum's testimony or the tapes. The trial court considered and accepted Mr. Marcum's explanation of how he determined the date and time of the excerpts included on the videotape he prepared. We find no error with the trial court's decision to allow the tape into evidence. Defendant's conviction is affirmed.

### *Excessive Sentence*

Defendant contends his sentence of forty years at hard labor, without benefit of probation, parole, or suspension of sentence is an excessive sentence. Armed robbery is punishable by imprisonment at hard labor for not less than ten years nor more than ninety-nine years, without benefit of parole, probation, or suspension of sentence. La.R.S. 14:64.

In *State v. Cook*, 95-2784, p. 3 (La. 5/31/96), 674 So.2d 957, 959, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996), the supreme court held that when a defendant claims a sentence is excessive "[t]he only relevant question on review . . . [is] 'whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.' *State v. Humphrey*, 445 So.2d 1155, 1165 (La.1984)."

At sentencing, the trial court observed that Defendant had five prior felonies and discussed several factors outlined in La.Code Crim.P. art. 894.1. Defendant contends the trial court should have considered that none of his prior felonies were violent crimes and that he was employed at the time of this robbery. He urges that it was error for the trial court not to consider his personal history, that his sentence is

grossly disproportionate to the severity of the crime, and that he is not the worst offender. He claims he should not have to spend what will likely be the rest of his life in jail.

In light of Defendant's five prior felony convictions, we cannot say the trial court abused its discretion in sentencing him to forty years for armed robbery of two victims. This assignment lacks merit.

### *Disposition*

Defendant's conviction and sentence are affirmed.

**AFFIRMED.**