COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

VERSUS

DOUGLAS PAUL JAMES

**********

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 97243
HONORABLE TONY A. BENNETT, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and Charles G. Fitzgerald, Judges.

AFFIRMED AND REMANDED WITH INSTRUCTIONS.

Annette Roach
Louisiana Appellate Project
P. O. Box 6547
Lake Charles, LA 70606-6547
(337) 436-2900
COUNSEL FOR DEFENDANT-APPELLANT:
     Douglas Paul James

Terry Wayne Lambright
District Attorney, 30th Judicial District Court
William R. Thornton
Assistant District Attorney
P. O. Box 1188
Leesville, LA 71446
(337) 239-2008
COUNSEL FOR APPELLEE:
     State of Louisiana

**PICKETT, Judge.**

## FACTS

The defendant, Douglas Paul James, was charged by bill of information with second degree battery, a violation of La.R.S. 14:34.1. He was convicted as charged. The court imposed an eight-year hard labor sentence, suspended one year, and placed the defendant on supervised probation for three years. The court imposed a fine of $2,000.00 and court costs, both of which are to be paid during probation. Additionally, the defendant was ordered to pay a monthly supervision fee of $65.00 and a monthly sex offender technology fund fee of $11.50. The defendant is before this court appealing both his conviction and sentence.

## ERRORS PATIENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there is one error patent.

For the defendant's conviction of second-degree battery, the court sentenced him to serve eight years at hard labor with one year suspended. The defendant was placed on supervised probation for three years and ordered to pay a monthly supervision fee of $65.00 and $11.50 per month to the sex offender technology fund. Additionally, the defendant was ordered to pay a $2,000.00 fine and court costs. A monthly payment plan *was* established for the supervision fee and the sex offender technology fund fee; however, a payment plan was not established for the $2,000.00 fine and court costs. Accordingly, the defendant was not put on notice of how the fine and court costs must be paid to comply with his probation and avoid possible revocation. Thus, the defendant's case must be remanded for the establishment of a payment plan in compliance with La.Code Crim.P. art. 875.1.

## ASSIGNMENTS OF ERROR

1. The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, was insufficient to prove beyond a reasonable doubt that Douglas Paul James committed second degree battery.

2. The evidence introduced at the trial of the case was sufficient to establish by a preponderance of the evidence an affirmative defense in that Douglas Paul James' actions were justified in defense of himself or others.

3. The maximum hard labor sentence imposed in this case on this first felony offender is nothing more than cruel and unusual punishment and, thus, a violation of the Eighth Amendment of the Constitution of the United States and La. Constit. Art. 1, § 20 prohibitions against excessive sentences.

## DISCUSSION

### Assignments of Error Numbers One and Two

The defendant argues these two assignments of error together. He contends the evidence introduced at trial was insufficient to prove beyond a reasonable doubt that he committed second degree battery. He does not contest the fact that he hit Woodie Blanks, Jr., the victim, nor the extent of the injuries suffered by Mr. Blanks. He contends, as he did at trial, that his actions were justified under the facts of the case. Alternatively, he contends the state did not prove beyond a reasonable doubt that he had the specific intent to inflict great bodily harm upon the victim. He argues that the victim's testimony alone cannot support the conviction due to the inconsistencies between his trial testimony and his statements to police, witnesses' testimonies, and the medical evidence.

*Evidence Presented at Trial*

At trial, the victim, Mr. Blanks, a sixty-eight-year-old veteran, testified that he delivered newspapers for the Lake Charles American Press. One of his customers, Wallace James, a cancer patient, requested that Mr. Blanks place his newspaper near the steps of his house rather than in the canister by the road. Thus,

2

Mr. Blanks either placed the newspaper on the porch, or, if Mr. James was on the porch, he handed it to him.

On the day of the incident, December 17, 2021, Mr. Blanks began working at approximately 1:00 a.m. Complying with COVID safeguards, the American Press advised employees to wear plastic gloves and a mask, which Mr. Blanks did that day, along with his jeans, a shirt, and tennis shoes. That morning, instead of driving into Mr. James' driveway, Mr. Blanks left his vehicle (running) on the road. He walked up the driveway and handed Mr. James his paper. While he was doing so, two vehicles pulled up near his truck, one on the left side, and one behind his truck. Finding this odd, Mr. Blanks said he pointed it out to Mr. James, but he received no response. Mr. Blanks then walked down the driveway to return to his truck. As he did, he noticed two people had exited the vehicle parked on his left side and two people had exited the vehicle behind his truck. The two people from the rear vehicle came across the yard wanting to know what he was doing in their grandfather's driveway. Mr. Blanks said he "told him that his grandpa was sitting right there on his porch, that he could speak with him." As Mr. Blanks was speaking to the two people coming "across behind the vehicle," he was "sort of blindsided," knocked to the ground, and was beaten up. He said he was first hit in the chest, then when he was knocked to the ground, two other people got on top of him and began beating him while the other two kicked him. Shortly thereafter, he received "a number of" punches, all of which hit him in the face except where he was being kicked. He heard Mr. James yell for the beating to stop and for them to leave Mr. Blanks alone, but the beating continued until Mr. James pulled them off him. He further explained:

> Even after, when I left out - - they left, uh, it was a little short guy, he, uh, hit me in the stomach and I just looked at him and he was saying that "I will - - I'll kill him." And it went through my mind, was where

is this coming from?  And, uh, that's when I felt like I better leave while I could.

As Mr. Blanks tried to leave, he realized the keys to his truck were missing, and Mr. James brought them to him.  According to Mr. Blanks, he did not receive an apology.  Mr. Blanks testified that he felt his life was in danger and that he "didn't have pretty much no vision at all," but he knew he had to leave.   Mr. Blanks denied wearing a hoodie, a hat, or any covering on his head.

On cross-examination, Mr. Blanks testified that no one asked him who he was.  He explained, "one of the two individuals that came from behind my vehicle, wanted to know what I was doing in their grandfather's - - grandpa's driveway . . . at 3:00 in the morning." As Mr. Blanks was saying that his grandfather was on the porch and that he could talk to him, he was attacked.  When he tried to leave, he could not because his vehicle keys were gone.  When Mr. Blanks was asked about the discrepancy between his trial testimony and his oral and written statements, he explained, "I didn't tell too much of anything to anybody.  The statement that I wrote is what I wrote.  I was in no condition to give a statement or to write a statement.  I was given paperwork, uh, that when I was in condition enough and asked to come down to the station and - - and bring the written statement."  Mr. Blanks was asked why he did not tell law enforcement that four people were beating him and two were kicking him on the ground as he testified to at trial.  He explained:

> if I didn't include that in the statement, I thought I did.  And if I didn't include it, when I spoke with the deputy, I made my case to him that that was the case.  And when Detective Wingate came to my house, I spoke - - spoke with him about it.  And he said that he un - - he knew that it was four people, but he just didn't know who the other two were.

Mr. Blanks testified that if the individual who asked him the question had taken a few minutes and checked with his grandfather, the situation would have

been cleared up. He said he was not running and had nothing in his hands to indicate he was attempting to steal anything. Additionally, he noted he did not have his vehicle keys. He said the perpetrators could have called the police or taken his license plate number.

The first officer Mr. Blanks encountered was Officer Robert Green of the Rosepine Police Department. Officer Green heard the victim beating on the rear door of the station and when he saw the victim, he noticed facial bruising, swollen eyes, and some blood. The victim was agitated and appeared to be in pain. Officer Green called for emergency response, then left to go to an apartment complex where he initially believed the incident occurred. Unable to locate the suspects, he returned to the police department where he noticed the victim driving out of the parking lot heading north. Officer Green observed the victim having difficulty "maintaining the lane," so he pulled him over at a gas station and had medical emergency assistance respond there instead of the station. When Officer Green learned that the incident occurred outside his jurisdiction, he called for a parish deputy.

Jacob Durrett of the Vernon Parish Sheriff's Office testified that on December 17, 2021, he took a verbal statement from Mr. Blanks and observed no defensive wounds on the victim's hands indicating he tried to fight back.

Detective Wade Wingate, a detective with the Vernon Parish Sheriff's Office, learned from Deputy Durrett that the suspects were possibly grandsons of Mr. James, and that a Jeep may be involved. He proceeded to the location where most of the James family lived and observed a Jeep at that location. When he knocked on the door, the defendant answered. Detective Wingate testified that he read the defendant his rights, and after the defendant acknowledged that he understood his rights, he voluntarily spoke to Detective Wingate.

5

The defendant told him that he and his brother, Dillon James, were riding around when they saw a pickup truck sitting on Catfish Hut Road near his grandparents' house. No one was in the truck, and when he started walking up the driveway to check on his grandparents, he met a man (the victim) wearing a hood and mask, coming down the driveway. The man, who would not answer him when he asked him why he was at their grandfather's house, started moving towards his truck. The defendant and his brother Dillon hit the victim at about the same time, and Mr. James began yelling at them to stop. Mr. James then helped the victim up and asked him if he was alright.

Detective Wingate subsequently spoke to the defendant's brother, Dillon, Mr. James, and the victim. The focus of his investigation did not change from the defendant and Dillon being the perpetrators, and he sought arrest warrants for them.

On February 2, 2022, Detective Wingate was contacted by Detective Twyman who had spoken to Travis Moses. Thereafter, Detective Wingate met with Mr. Moses and learned that other people were present when the incident occurred, including Charles "Max" Courville. Detective Wingate then spoke to Mr. Courville, who told him that Kara Edwards and Chelsea Coleman were also present. He spoke with them as well, and after speaking to each of the witnesses, the course of his investigation did not change. According to Detective Wingate, the defendant, Dillon, and Max Courville all told him that the victim would not tell them who he was when they asked. Mr. Moses said that the victim said, "If you've got a problem with me, go ask the man up there." The victim told Detective Wingate that he told them if they wanted to know what he was doing, they should ask the man at the house.

Travis Moses, a friend of the defendant's, testified that on the night in question, he was hanging out with Dillon, and he went to the defendant's house around 1:30 a.m. When he arrived, present were the defendant, Dillon, Max Courville, and two females. The group decided to go mud riding, and around 2:00 a.m., Travis left in Max's Jeep with Max and Dillon to go mud riding. The defendant followed in another Jeep with Kara and Chelsea.

On the way to the creek, they passed the defendant's grandfather's home and observed a dark Ford truck parked in the middle of the road, which they found suspicious. They looked in the truck bed for stolen items, and Dillon and the defendant walked up the driveway to investigate. They came upon the victim, who was walking back from the home. Several times, they asked him what he was doing there, and he responded, "If you've got a problem with what I'm doing, you can just talk to these people here." According to Travis, no one ran up to the porch or called the police. The defendant and Dillon "started attacking [the victim] or hitting him." At some point after the victim hit the ground, Travis said he pulled Dillon out of the fight. Travis confirmed that Mr. James told his grandsons to stop, that the victim was delivering the newspaper. Travis testified that the situation diffused, and he believed the defendant helped the victim off the ground. When they asked the victim why he did not tell them he was delivering the newspaper, the victim said he did. An argument over this ensued for a few minutes, and then the victim left the scene. According to Travis, before the victim left, the defendant apologized to him, and he also told his grandfather, "I'm sorry, Pawpaw, we thought he was a thief." Travis testified that he has known the defendant for at least twelve years, and he is not a troublemaker or instigator. He did not recall the defendant ever being in a fight.

7

Charles "Max" Courville, another friend of the defendant, testified that he, Travis, and Dillon were riding in Max's Jeep when they left the defendant's house. The defendant followed in his Jeep with two women as passengers. Max's testimony was like that of Travis. Max confirmed that the situation seemed abnormal, and he was uneasy pulling up to a vehicle blocking the road. The uneasiness was not alleviated when he saw a tall man with a mask, hood, and gloves walking down the driveway. In the years he has known the defendant, he did not recall ever seeing him in a fight.

The defendant, thirty-three at the time of trial, testified that he was previously convicted of DUI when he was twenty-one, but he had no other convictions. He lived about a half mile down the road from his grandfather, and over the past couple of years there had been several incidents at his grandfather's house. The year before, on nearby property, they had to "tase and mace" someone in the yard who was trying to get into the house.[1]

The defendant testified that on the night in question, he, Chelsea, and Kara were riding in his Jeep, and the women did not get out. In Max's Jeep were Max, Travis, and Dillon. They saw a vehicle in the middle of the road blocking his grandfather's driveway, so he and Dillon got out and confronted the victim about midway up the driveway. It was dark outside, and the victim had on gloves, a "longer shirt," and "some kind of facial mask." When asked if Mr. Blanks had a hoodie on, the defendant replied, "[h]e had some kind of longer jacket, pullover type hoodie, whatever you would want to call it." According to the defendant, Mr. Blanks continued walking toward them and they confronted him numerous times. He asked Mr. Blanks what he was doing at his grandfather's house, but he got no response. Dillon asked the same question and received no response. According to

---

[1]It is not clear what house the perpetrator was trying to enter.

the defendant, this continued at least four to five times, and Mr. Blanks continued walking toward them, not saying anything until the incident was over. The defendant testified that Mr. Blanks did not appear to be a 67-year-old frail, elderly man. He testified that as Mr. Blanks came closer, he did not know what else to do; he panicked, swung, and hit him. He affirmed that he was in a "fight or flight" mode, and he said he did not know what Mr. Blanks was going to do when he came closer. After he and Dillon hit Mr. Blanks, the defendant heard his grandfather yell from the porch. The defendant said he ran toward his grandfather, and then the two walked back to where Mr. Blanks was. The defendant said, "we were helping him up, and that's when Pawpaw was telling us that that was his mailman. That's when we figured that out." According to the defendant, it was not a continuous beating, and Max and Travis were "back towards the road" when this took place. The defendant was asked whether this would have happened if Mr. Blanks had tried to walk around him or put his hands up and say, "I'm the newspaper guy," and the defendant said it would not have. He testified that he did not intend the consequences. According to the defendant, when he and his grandfather approached Mr. Blanks, they helped him off the ground, told him "sorry" a few times, and escorted him to his vehicle. There was some discussion after that point between the defendant and his grandfather about the victim being the newspaper man.

On cross-examination, the defendant admitted he confronted the victim, and his brother Dillon was with him. According to the defendant, he and his brother hit the victim at the same time; they were "almost shoulder touching each other, and he was right in [their faces]." They intended to knock on the door to check on his grandfather, but the victim met them before they reached the porch.

The defendant was shown his brother's statement, which indicated that he was in the vehicle with the defendant. The defendant disputed this and said his brother was in the vehicle with Max. He testified he had no knowledge that night that the victim's keys were taken. When asked if he agreed he had other options than to hit the victim, the defendant responded, "At that time, I wasn't sure of what he was gonna [sic] do to me, when he got that close." The defendant said he was scared, and he did not keep beating the victim. He said he hit him one time to get him out of his face. He said the fight was over by the time his grandfather came partially down the driveway to stop it.

When asked if he ever had the thought that Mr. Blanks was simply trying to get to his vehicle that was behind the defendant, the following exchange occurred:

Q. Did it ever - - did it ever dawn on you that Mr. Blanks was trying to get to his vehicle that was behind you?

A. He shouldn't have got that close into my face. He could have walked around.

Q. You confronted him, correct?

A. Just asking him why he was there, and he would not tell us.

Q. And because he wouldn't tell you, did you ever find any of your grandfather's property on him? You didn't - - you didn't find anything on him that belonged to your grandfather, did you?

A. No, sir.

Q. And your grandfather was nowhere around at that moment, was he?

A. No, sir.

When confronted with Travis's (who was closer to the road) testimony that he heard the victim say several times, "If you want to know why I'm here, tell those - - ask those people. Your grandfather's on the porch," the defendant responded that he did not hear this.

10

Max was recalled as a witness for the defense. He testified that neither he nor Travis hit or kicked Mr. Blanks. He said the defendant and Dillon were the only two in the altercation. He said he was not asked by law enforcement whether he was involved in the altercation. On cross-examination, he confirmed that he removed the keys from the victim's vehicle. Travis was also recalled as a witness. He denied ever kicking or hitting Mr. Blanks and testified that the police did not ask him whether he kicked Mr. Blanks. He confirmed that the defendant and his brother were the only ones hitting Mr. Blanks.

Dillon James, the defendant's brother, testified that he and his brother were approached by the victim, who was wearing a big coat, mask, and gloves, about halfway up the driveway as they were going to check on their grandfather. He and the victim stopped a few feet from each other, and he and the defendant began asking the victim what he was doing at their grandfather's house. Although asked two or three times, the victim did not respond. When asked if the victim responded at some point, Dillon testified, "I remember the last - - last time asking what he was doing at my grandpa's house, I remember a - - a remark was he said, "If this is your grandpa's, you can ask him." The victim continued walking toward him. Dillon testified he was scared, and he was concerned about his grandfather. The defendant hit the victim, and Dillon went to the ground with the victim. The victim briefly fought back, and the fight was over in a few seconds. When they got up, his grandfather was there, and they walked the victim to his truck. He clarified that he and his brother rode in separate vehicles that night, and he said he did not look in the victim's truck when they stopped at his grandfather's house.

Dillon affirmed that Travis pulled him off the victim but said that Mr. James did not pull the defendant off the victim. Mr. James walked with the defendant down to the fight. Dillon confirmed that the victim did not swing or lunge at them.

They confronted him. However, Dillon confirmed that his impression was that the victim was "gonna go through [him], if [he] didn't get out of the way." He testified that nothing would have happened if the victim had said he was delivering newspapers.

As for the injuries sustained by Mr. Blanks, Dr. Chanping Liang, an ophthalmology surgeon and professor of ophthalmology at LSU Shreveport, was accepted as an expert in the field of ophthalmology. She testified that when she saw Mr. Blanks, she was told he had been assaulted the night before. She observed extensive bruises and bleeding in both of his eyes. The left eye had a severe dense subconjunctival hemorrhage indicative of a ruptured eyeball. The right eye also had bruises and a hemorrhage, but to a lesser degree. Scans showed his right eye had an orbital floor fracture, i.e., a break in the bony area below the eyeball. The injuries to his left eye required surgery, during which the blood clots were removed, and intraocular contents came out. She attempted to suture the laceration of the eyeball, but she could not successfully suture the entire laceration due to its severity and length/location. The right eyeball was left intact for the bleeding to resolve by itself. Mr. Blanks lost sight in his left eye. Although not functional, Mr. Blanks opted to keep his eyeball intact. There is a rare possibility that the right eye can become inflamed and develop sympathetic ophthalmia, in which case Mr. Blanks would lose sight in that eye as well. According to Dr. Liang, this disease can occur many years later.

_Definition of Second Degree Battery and Specific Intent Requirement_

Louisiana Revised Statutes 14:34.1 defines second degree battery as "a battery when the offender intentionally inflicts serious bodily injury[.]" Serious bodily injury is defined in La.R.S. 14:2(C) as, "bodily injury which involves unconsciousness; extreme physical pain; protracted and obvious disfigurement;

12

protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death." It is a specific intent crime. *State v. Robertson*, 98-883 (La.App. 3 Cir. 12/9/98), 723 So.2d 500, *writ denied*, 99-658 (La. 6/25/99), 745 So.2d 1187.

> Specific intent is defined in La.R.S. 14:10 as the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." Specific intent can be inferred from the circumstances of the incident and the defendant's actions. *See State v. Wommack*, 00–137 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, *writ denied*, 00–2051 (La.9/21/01), 797 So.2d 62.

*State v. Hicks*, 10-19, p. 5 (La.App. 3 Cir. 6/2/10), 38 So.3d 1262, 1265, *writ denied*, 10-1548 (La. 2/11/11), 56 So.3d 998. "[S]pecific intent to cause serious bodily injury 'may be inferred from the extent and severity of the victim's injuries.'" *State v. Williams*, 20-605, p. 33 (La.App. 3 Cir. 11/3/21), 329 So.3d 938, 955, *writ denied*, 21-1798 (La. 4/12/22), 336 So.3d 85 (quoting *State v. Hager*, 13-546, p. 6 (La.App. 5 Cir. 12/27/13), 131 So.3d 1090, 1093).

On appeal, the defendant contends the state did not prove beyond a reasonable doubt that he had the specific intent to inflict great bodily harm. The defendant testified that he was unaware his punch could cause so much damage, damage he did not intend to cause. He notes that he hit the victim (who did not appear to be an elderly man) one time, he did not continue the beating, and the encounter lasted only seconds. He argues the state presented no history of aggressive behavior, and there was no attempt for the defendant to engage with Mr. Blanks until Mr. Blanks came toward him and "got in his face." There was no medical testimony that the injuries resulted from multiple blows. Further, the defendant argues that the victim's testimony is insufficient to support factual conclusions that he was repeatedly beaten and kicked or that he told the defendant why he was at that location.

The state contends that the serious debilitating injuries suffered by the victim, who lost the vision in one eye and could lose his vision in the other due to one or two punches in the face, was sufficient to meet the specific intent requirement.

> When the issue of sufficiency of evidence is raised on appeal, the reviewing court determines whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). Discretion in determinations of credibility is vested in the jury, which may accept or reject testimony within the bounds of rationality, and we will only impinge upon its discretion "to the extent necessary to guarantee the fundamental protection of due process of law." *Mussall*, 523 So.2d at 1310. Thus, other than ensuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *State v. Ryan*, 07-504, p. 2 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268, 1270 (quoting *State v. Lambert*, 97-64, p. 5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727).
>
> However, the *Jackson* standard "does not permit the reviewing court to view just the evidence most favorable to the prosecution and then to decide whether that evidence convinced it beyond a reasonable doubt." *Mussall*, 523 So.2d at 1310. "Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *State v. Allen*, 36,180, p. 5 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, 626, *writs denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, 02-2997 (La. 6/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).

*State v. Thomas*, 17-959, pp. 13-14 (La.App. 3 Cir. 9/26/18), 255 So.3d 1189, 1199, *writs denied*, 18-1757, 18-1662 (La. 4/22/19), 268 So.3d 294, 303.

In *State v. Diaz*, 612 So.2d 1019, 1022-23 (La.App. 2 Cir. 1993), in reviewing the sufficiency of the evidence presented to support a second degree battery conviction, the court stated:

> Defendant makes much of the fact that he only struck the victim once, failed to knock the victim to the floor or render him unconscious, and did not pursue the victim after striking him. These

14

factors, argues the defendant, indicate an absence of intent to cause serious bodily harm. We do not agree. The supreme court has firmly rejected the notion that the second degree battery statute envisions an offender who mercilessly beats a fallen victim. *Fuller,* supra. The statute clearly states that the intended harm is "serious bodily injury" and defines this to involve, among other things, unconsciousness, extreme physical pain or protracted and obvious disfigurement. Under the circumstances of this case, when Diaz struck Bullock as hard as he could, he intended to cause serious bodily injury as contemplated by the statute. See *State v. Accardo,* 466 So.2d 549 (La.App. 5th Cir.1985) (statutory requirements met where single blow to victim's head merely caused swelling and a stunned reaction).

Indeed, as a consequence of the defendant's blow, Bullock's jaw was broken in two places. He testified that his mouth was bleeding after the blow and his jaw "just kinda jingled." He further stated that some of his teeth appeared to be missing but that he later learned the gap in his lower row of teeth was caused by the separation of the fractured pieces of his mandible. Dr. Willis confirmed that the fractures created a six millimeter gap between Bullock's teeth, and he described the breaks in Bullock's jaw as a "serious injury." Bullock described his pain as "excruciating," and his mother testified that he was asking for a pain shot at the hospital. The injury required a five-hour reparative surgery during which Bullock was under general anesthesia. For approximately two months following surgery, Bullock's mouth was wired shut, which kept him from eating solid foods and greatly impaired his ability to speak. According to his mother, at the time of trial, some eight months after the fight took place, Bullock's face was still disfigured, and he was still having reparative work done to his teeth.

We find that, viewing the evidence as a whole in a light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt that Diaz struck Bullock without the latter's consent and with the specific intent to cause serious bodily injury.

In *State v. Fuller*, 414 So.2d 306, 310 (La.1982), the supreme court upheld

the defendant's conviction for second degree battery, stating:

Defendant is a thirty-year old man whose occupation is a bouncer at the business where the battery occurred. The defendant was not working the night of the offense, but was spending his free time at the lounge that evening. The victim was a much younger man than defendant, approximately nineteen, and considerably smaller. The defendant hit the victim with a blow sufficient to knock him over the pool table. The blow caused the victim's sight to be permanently impaired. Under these circumstances, a rational trier of fact could certainly have found that defendant possessed the intent to do "serious bodily harm." When a much stronger man hits a younger, smaller

man, the fact finder could rationally conclude that the offender intended to cause, at a minimum, unconsciousness and/or extreme physical pain.

In the present case, the defendant and his brother confronted the victim several times in the driveway asking what he was doing at their grandfather's house.  The defendant's brother, Dillon, and Travis each testified that they heard the victim say something to the effect that if they wanted to know what he was doing there, they could ask their grandfather.  There was no testimony indicating the victim swung or lunged at the defendant, only that he was close to the defendant's face and did not go around them to get to his truck. The defendant and his brother struck the elderly victim with such force that serious injury resulted. Under the facts of this case, we find a rational trier of fact could have found the defendant possessed the intent to inflict serious bodily injury when he struck the victim.

*Justification/Self-Defense*

The defendant contends he acted out of fear and was not the aggressor in this situation.  He claims he acted in self-defense and was justified in hitting Mr. Blanks to prevent a battery upon himself.

The defense of justification is set forth in La.R.S. 14:18:

> The fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct. This defense of justification can be claimed under the following circumstances:
>
> . . . .
>
> (7) When the offender's conduct is in defense of persons or of property under any of the circumstances described in Articles 19 through 22.

Louisiana Revised Statutes 14:19 provides in pertinent part:

> A. (1) The use of force or violence upon the person of another is justifiable under either of the following circumstances:

16

(a) When committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense.

. . . .

C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using force or violence as provided for in this Section and may stand his or her ground and meet force with force.

In *State v. Ross,* 18-453, pp. 31-32 (La.App. 3 Cir. 3/13/19), 269 So.3d 1052, 1072, *writ denied,* 19-581 (La. 1/22/20), 291 So.3d 1041, this court stated:

As for the defendant's claim of justification, the jurisprudence states the following:

A different justification provision applies to Defendant's self-defense claims for the two attempted second-degree murder convictions:

A. The use of force or violence upon the person of another is justifiable when committed for the purpose of preventing a forcible offense against the person. . . provided that the force or violence used must be reasonable and apparently necessary to prevent such offense

. . . .

La.R.S. 14:19. "In non-homicide cases, . . . the defendant [has] the burden of proving self-defense by a preponderance of the evidence. The issue of self-defense requires a dual inquiry: (1) an objective inquiry into whether the force used was reasonable . . . ; [and] (2) a subjective inquiry into whether the force was apparently necessary." [*State v.*] *Hall*, 606 So.2d [972] at 973–74 [ (La.App. 3 Cir.1992) ] (citations omitted).

*State v. Williams*, 10-900, p. 4 (La.App. 3 Cir. 3/9/11), 2011 WL 798878 (unpublished opinion), *writ denied*, 11-1060 (La. 12/2/11), 76 So.3d 1173.

As stated earlier, it is apparent that the jury in the present case did not believe the defendant's testimony. Considering the evidence in a light most favorable to the state, the evidence shows the defendant intentionally confronted the victim about his driving, yelled

17

obscenities at him, and threatened to kill him. The victim approached the defendant carrying a gun on his side, but not holding the gun in his hand, and told the defendant to leave the scene. Instead of simply leaving the scene, the defendant accelerated forward and intentionally ran over the victim with his car. Even if the defendant felt threatened by the holstered gun, the defendant's choice to run over the victim instead of leaving the scene was not reasonable. Under these circumstances, the jury rationally determined the force used by the defendant was neither reasonable nor necessary under the circumstances.

This assignment lacks merit.

In the present case, considering the evidence in a light most favorable to the state, the evidence showed the defendant and his brother intentionally confronted the victim in their grandfather's driveway. The victim approached them as he was walking down the driveway but took no aggressive action toward either the defendant or his brother, other than getting close to them and not walking around them. The defendant and his brother could have left, gone around the victim to check on their grandfather, or called police with a description of the victim and his vehicle/license plate number. Under the circumstances presented in this case, the jury rationally determined that the force used was not reasonable nor apparently necessary to prevent an offense against the defendant.

*Internal Contradictions or Irreconcilable Conflict with Physical Evidence*

The defendant contends Mr. Blanks' testimony was not credible and should not be relied on in determining the sufficiency of the evidence. Specifically, he notes that the victim said he was hit in the chest area, then two guys got on top of him and were beating him while two other guys started kicking him. Later, he testified that all punches hit him in the face except when he was kicked. This testimony as to the location of the punches was internally inconsistent and was also contradicted by what the victim told several officers after the incident.

18

Another inconsistency pointed out is that Deputy Durrett stated in his report that two to four white males pulled the victim out of his vehicle, started hitting him, and then left. He offered no explanation regarding the statement that the victim was pulled out of the vehicle or that he told the men he was delivering newspapers. At trial, the victim testified that he told the defendant and his brother that they could speak to their grandfather, not that he was delivering newspapers.

Additionally, the defendant notes that his brother heard the victim's response as he tackled him. Travis testified that he heard the victim say if anyone had a problem with him being there to ask "these people" but it was not clear at what point in the encounter this statement was made.

Finally, the defendant's testimony that he was beaten by two men and kicked by the other two was inconsistent with other testimony presented at trial. Additionally, the victim's testimony that he attempted to protect himself by covering his face with his hands was disputed by photographs of his hands and arms which showed no signs of scrapes or bruising. He argues that both the photographs and medical reports contradict the victim's statements that he received a prolonged beating and kicking by four men.

Even without the victim's testimony, there was sufficient evidence presented to prove the defendant hit the victim with specific intent to cause great bodily injury. The defendant admitted he hit the victim. Other witnesses heard the victim tell the defendant to speak to his grandfather if he wanted to know why he was there. Although the defendant said he hit the victim because he was scared and he wanted to get him out of his face, when he was asked if it ever dawned on him that the victim was trying to get to his vehicle which was behind the defendant, he responded, "He shouldn't have got that close into my face. He could have walked around." When asked if he confronted the victim, the defendant replied, "Just

19

asking him why he was there, and he would not tell us." The defendant's brother confirmed that they confronted the victim and he never swung or lunged at them. It was his impression that the victim was "gonna go through [him] if [he] didn't get out of the way." The injuries sustained by the victim caused extensive bruising and bleeding in both eyes, with the damage to the left eye so severe that the victim lost his vision in that eye, according to Dr. Liang. These facts, without the victim's testimony, were sufficient to prove the elements of the offense beyond a reasonable doubt and this claim has no merit.

## Assignment of Error Number Three

The defendant contends the facts of this case do not warrant a maximum sentence of incarceration with only one year suspended. The defendant notes that he was thirty-three at the time of the trial, and caring for a three-year-old son in a shared custody arrangement with the child's mother. At the time of sentencing, the defendant was supporting his fiancé, Laura Myers, as well as her child, and they had another child on the way. The defendant and Ms. Myers, who was twelve weeks pregnant, planned to marry the weekend after sentencing. Ms. Myers testified she had been in a relationship with the defendant for approximately nine months and had lived with him for about two or three months. She described the defendant as a good father who paid child support despite the absence of a court order.[2] She said the defendant was a person with good morals, a good work ethic, a family man, and a person who would comply with conditions of probation as he was never one to run from his problems. The defendant's mother described him as a kind person, with a big heart, who was not a troublemaker. He worked for his

---

[2]Ms. Myers testified that she knew the defendant prior to their nine-month relationship because their families knew each other, and she had been around him a few times.

prior employer for eleven years before his termination over this incident. She testified that he abided by the conditions of probation when convicted of DWI.

Riley Milner, the defendant's employer, who has known the defendant since birth,[3] testified that the defendant is a good worker, has good moral character, and he has never known the defendant to be in trouble other than his prior DWI. He testified that the defendant would continue to have a job with him as long as he needed to work, and he felt that the defendant was the kind of person who would take probationary conditions seriously.

The defendant argues that the court imposed the sentence based on the extent of injury to the victim's eyes and did not consider the defendant's personal history, need to support his family, and good work history. The state contends that the defendant has failed to prove that the trial court abused its wide discretion in imposing sentence, and it fully considered all relevant mitigating factors and concluded they did not outweigh the permanent, incapacitating, and painful harm inflicted on the victim.

For second degree battery, the defendant faced a maximum eight-year sentence at hard labor and a fine of not more than two thousand dollars. As discussed above, he was sentenced to eight years with one year suspended and three years of supervised probation. This court addressed an excessive sentence claim for the imposition of a maximum sentence for second degree battery in *State v. Williams,* 20-609, pp. 20–27 (La.App. 3 Cir. 10/20/21), 329 So.3d 885, 897-900:

> On appellate review of sentence, the relevant question is " 'whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.' " *State v. Cook*, 95-2784, p. 3 (La. 5/31/96), 674 So.2d 957, 959 (quoting *State v. Humphrey*, 445 So.2d 1155, 1165 (La.1984)), *cert.*

---

[3]Mr. Milner testified that he is a friend of the defendant's father, and the defendant also worked for him while in high school.

*denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). In this context, a trial court "abuses its sentencing discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes 'punishment disproportionate to the offense." ' *State v. Soraparu*, 97-1027 (La. 10/13/97), 703 So.2d 608 (quoting *State v. Sepulvado*, 367 So.2d 762, 767 (La.1979)).

*State v. Thomas*, 98-1144 (La. 10/9/98), 719 So.2d 49, 50.

Louisiana courts have laid out the following guidelines with regard to excessive sentence review:

Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:

La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99), 746 So.2d 124, *writ denied*, 00-0165 (La. 6/30/00), 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and

background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957, 958[, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 [136 L.Ed.2d 539] (1996)].

*State v. Soileau*, 13-770, 13-771, pp. 4-5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005-06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.

In *State v. Baker*, 06-1218 (La.App. 3 Cir. 4/18/07), 956 So.2d 83, *writ denied*, 07-320 (La. 11/9/07), 967 So.2d 496, *and writ denied*, 07-1116 (La. 12/7/07), 969 So.2d 626, this court adopted the fifth circuit's three factor test regarding the suitability of sentences from *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183, which established that an appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes.

Pursuant to *Baker*, we first consider the nature of the crimes for which the defendant was convicted. Louisiana Revised Statutes 14:2(B)(6) defines second degree battery as a violent crime. Further, although not explicitly designated a crime of violence under La.R.S. 14:2(B), by its very definition, battery of a healthcare professional producing injury is a violent offense in that it necessarily involves violent actions by the offender producing injury to the victim. The second *Baker* factor involves a review of the nature and background of the offender. The defendant's arguments as to the excessiveness of his sentences are related to the fact that these are his first felony convictions and that he suffers from mental illness and is in need of treatment. The defendant was twenty-eight years old at the time of the attack on Ms. Smith and was almost thirty when he was sentenced. The defendant has a high school education and does not appear to have any children. During sentencing, the trial court acknowledged that there have been concerns about the defendant's volatility as far back as when he was in elementary school, and that the defendant had

been in need of mental health treatment for years prior to the current incident.

The defendant contends his sentences are excessive precisely because he was in need of mental health treatment. However, as noted by the trial court, the defendant has repeatedly failed to take prescribed medication for his mental illness and instead has opted to self-medicate with illegal drugs and alcohol. The defendant also contends his sentences are excessive because he is a first felony offender. While technically  true, the State listed thirteen prior misdemeanor offenses, most of which were simple battery charges and were, therefore, violent crimes. Furthermore, as noted by the trial court, a number of those battery charges were ultimately dismissed because the victim was the defendant's mother, Ms. Rose Williams, who would not cooperate with any prosecution.

Finally, *Baker* directs the court to consider sentences imposed in other cases for the same offenses. . . . Additionally, the eight-year hard labor sentence the defendant received for second degree battery also represents a maximum sentence.

In *State v. White*, 35,235 (La.App. 2 Cir. 10/31/01), 799 So.2d 1165, the second circuit upheld consecutive maximum sentences for a first offender convicted of simple robbery, conspiracy to commit simple robbery, and second degree battery, all arising out of the same robbery. That court noted:

> During sentencing, the trial court stated:
>
> > This is a heinous crime, one of the worst and unfortunately the District Attorney because of the way laws are written and because of the way the interpretations of the supreme court as to what they could charge you with, you were charged, entered a plea of guilty to the charges of simple robbery, conspiracy to commit simple robbery, and second degree battery. You heard what the lady said, broken jaws on the right side, left side, reconstruction, medical bills that will probably run into the thousands and thousands of dollars that they are going to have to find ways to pay for. It's traumatized not only the wife but the husband as well as their children. . . . But based on what I have seen in this case and what I can do as a judge, the only thing I can do is give the maximum sentence on each charge and I'm going to do that.

> Examination of the record indicates that the trial court adequately considered all facts, including the presentence investigation. The court obviously felt that the risk to public safety was so great as to justify maximum consecutive sentences. The court's concern was justified under the facts of this case. The victim

was viciously beaten, suffering severe and life-altering injuries which continue to plague her. As a result of the brutality inflicted upon this hapless woman, her family has also suffered considerable emotional distress. The defendant asserts that he is not "the worst of the worst," deserving of the maximum penalties. However, the trial court found that the defendant was, in fact, among the worst offenders; based upon this record, we must concur in the trial court's assessment.

> The record does not demonstrate that the consecutive sentences imposed are grossly out of proportion to the seriousness of the offenses, or nothing more than a purposeless and needless infliction of pain and suffering. Viewed in light of the harm done to society, the defendant's sentences do not shock the sense of justice.

In pronouncing the sentences imposed here, the trial court articulated its consideration of the sentencing guidelines of La.Code Crim.P. art. 894.1. Specifically, the trial court determined that there was an undue risk that the defendant would commit another crime if given a lesser sentence, that a lesser sentence would depreciate the seriousness of the crimes committed here, that the defendant is in need of correctional treatment or a custodial environment, and that the crimes committed manifested extreme cruelty to the victim and caused serious bodily injury. . . . Further, while recognizing the defendant as a first-felony offender, the trial court noted that it could find no mitigating factors relevant other than the defendant's mental issues.

We find no abuse of the broad sentencing discretion of the trial court. The defendant was found guilty of two separate crimes, though they constituted part of a continuing event. The batteries committed on nurse Smith were extremely violent and protracted. Nurse Smith was beaten about the head and body and kicked in her stomach and sides. She was seriously injured and disfigured, requiring medical attention, hospitalization, and continued therapy. She further suffered post-traumatic stress as a result of the incident and has not been able to return to work. The defendant expressed no remorse following the incident; instead laughing until told by attending officers that this was no laughing matter. Later, in his recorded telephone call, the defendant bragged about beating nurse Smith, referring to her using profane and vile language. That same recorded phone conversation reflects the defendant's callousness and deviousness, shown by statements from which one can draw the inference that he expects that he will get away with his acts because of his asserted mental illness. This reflects conscious thought, a knowledge of right and wrong, and not serious mental illness. The victim in this case did nothing to warrant the vicious attack by the defendant. In fact, she was there in her professional capacity to aid and assist the the defendant. She was rewarded by being violently attacked and seriously injured. This

25

record does not demonstrate that the sentences imposed are grossly out of proportion to the seriousness of the offenses. Indeed, the seriousness of the offenses warranted a serious sentence. Thus, we affirm the sentences imposed.

In the present case, after recounting the facts of the case, prior to imposing sentence, the court stated:

> The court did, in fact, go through the Sentencing Guidelines, uh, Article 894.1, and I'll talk about that a little later. Was economic harm caused to the victim? The answer is, "Yes." And I will talk about some other things shortly. This defendant is 33 years of age. He is married. He has one child and one on the way. The defendant is in good health. He is presently employed by Riley Milner, the Signman. He graduated from high school. He does not have a history of drug or alcohol abuse.

> This case was tried before a jury on August the 29th of 2021 [sic]. The jury found him guilty, and we are here today for sentencing. There was a sentencing hearing held on behalf of Mr. James, and I also received letters on his behalf. I also received letters from Mr. Blanks and his daughters, which I have also reviewed.

> As to the defendant's criminal history, this is his first felony. The only other criminal history he has is a DWI several years ago. The court looked, specifically, at Code of Criminal Procedure Article 894.1, the Sentencing Guidelines, for the aggravating and mitigating factors. As far as aggravating factors, the court finds that the offender used threats of or actual violence in the commission of the offense. The offense resulted in a significant permanent injury and economic loss to the victim and his family. A lesser sentence would deprecate the seriousness of the offense. As far as the mitigating factors are concerned, the court finds that the defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the instant offense. As I stated earlier, he had a prior DWI several years ago.

> The facts reflect that Mr. James and his brother attacked Mr. Blanks around 3:00 AM on the morning of December the 17th of 2021. The court's concerns are the injuries to Mr. Blanks. The testimony of Dr. Liang, at trial, shows that, as a result of the attack, Mr. Blanks had extensive bruising - - bruises and bleeding in both eyes. The left eye had a severe dense subconjunctival hemorrhage. In other words, the white part of the eyeball was ruptured. His right eye had a orbital floor fracture. He was then operated on and they found a laceration behind the eye and they had to remove a blood clot and he lost a lot of the fluids inside the eyeball, which resulted in significant pain. As a result of this incident, Mr. Blanks lost sight in his left eye. There is also a risk of losing sight in the right eye. These injuries did in fact cause severe pain during the time, and Mr. Blanks is still

experiencing severe pain. The victim stated to the court, in his letter, that, since the loss of his vision in his eye, he cannot shave; he cannot groom himself; he cannot cook; or bathe himself. He will forever need assistance. He has daily pain in his eyes and, on most days, it is unbearable. He has also neurological issues he didn't have before. He often has nightmares. He also lost and will forever lose the quality of enjoyment with his daughters and grandchildren in the future. He also lost the ability for income that he had prior to this incident. The court will note that there was not any bills provided to this court or any request for restitution. The court assumes that is because of the testimony at trial regarding a possible civil suit.

The testimony, at trial, from the defendant and his brother was that they did not intend to cause these results. Whether that is true or not has little, if any, to do with the outcome. Once you start down the road using violence, there is always a possibility of unintended results. The fact is Mr. Blanks' life was forever changed, on that fateful night, caused by the action of this defendant and his brother. I did read several letters from friends and family, on your behalf, all stating that you are a good person. I heard from your family and employers, at your sentencing hearing, testifying to your good character. I have no doubt this is true, but it does not change the injuries to Mr. Blanks from that night.

Considering the *Baker* factors, we note second degree battery is a violent crime. The defendant was thirty-three years old at the time of trial, had a job, and he had family members who relied on him for support. His prior criminal history consisted of a DWI, and according to his mother, he successfully complied with the associated probationary conditions. According to the testimony at the sentencing proceeding, he was not a troublemaker and did not have a violent past.

In pronouncing sentence, the trial judge articulated his consideration of the sentencing guidelines of La.Code Crim.P. art. 894.1, noting both mitigating and aggravating factors, most notably the degree of injuries suffered by the victim. The defendant received a high-end sentence, but not the maximum, in that one year of his sentence was suspended.

This court upheld the imposition of the maximum sentence in *Williams*, 329 So.3d 885. As in *Williams,* the victim's injuries were quite significant, having been beaten in the head and body and kicked in her stomach and sides. She was

disfigured, required hospitalization, and continued therapy, and she was unable to work due to post-traumatic stress.

Unlike the defendant, Williams had a more extensive criminal history consisting of multiple misdemeanor arrests/convictions. He suffered from mental illness for which he opted to self-medicate with drugs and alcohol. Williams had no children, and he expressed no remorse for his actions, even laughing and bragging about what he had done.

In *State v. Bowie*, 482 So.2d 90 (La.App. 4 Cir. 1986), the fourth circuit upheld the imposition of the maximum five-year sentence for second degree battery where the thirty-four-year-old unmarried, unemployed, heroin-addicted defendant threw a brick at a police officer during an altercation. The brick was thrown with such force that it broke into three pieces, and the injuries sustained by the unarmed officer, who had his back to the defendant as he was walking away, included a torn scalp, fractured skull, and injuries to the left shoulder and back. The defendant's criminal record consisted of a 1976 conviction for possession of heroin, a 1980 conviction of theft, and arrests for thefts, forgeries, possession of quaaludes, sale and possession of heroin, and automobile theft. He expressed remorse at his sentencing hearing, blaming his conduct on his experiences in the Vietnam war.

In the present case, as in *Bowie*, significant injuries were inflicted on the victim, and the defendant expressed remorse. Unlike *Bowie*, the defendant had a minimal prior criminal history, had a family to support, and was employed.

We further note *State v. Linnear*, 44,830 (La.App. 2 Cir. 12/9/09), 26 So.3d 303, where the second circuit affirmed a near maximum sentence for a defendant who became angry, lost control, knocked the victim unconscious, and left the scene with the victim unattended. The defendant's statement indicated that the victim

28

was "throwing" gang signs in the defendant's face and bumping into him at a nightclub, and the defendant eventually "went off" and punched him, knocking him to the cement floor. The victim did not have the opportunity to fight back, and the defendant got on top of him and repeatedly hit him. The victim's injuries, which consisted of multiple jaw fractures, a head injury, and an ensuing decubitus ulcer on his back, required weeks of intensive care and ongoing lengthy, costly rehabilitation. The defendant's criminal history consisted of misdemeanor convictions for disturbing the peace by fighting and domestic abuse battery, with prior terms of probation being revoked for noncompliance. He argued on appeal that the term of incarceration would place an undue hardship on his family as they relied on him both financially and in helping with the care of his disabled child who suffered from cerebral palsy. He noted that he participated in rehabilitative programs while incarcerated, including anger management.

In the present case, as in *Linnear*, significant injuries were suffered by the victim and incarceration presented hardship for the defendant's family. Unlike the defendant in *Linnear*, the defendant did not get on top of the victim and repeatedly hit him, and Linnear's criminal history included more convictions and terms of unsuccessful probation, which has not been an issue for the defendant.

In reviewing the record and the reasons for sentencing set forth by the trial court, we note he fully complied with La.Code Crim.P. art. 894.1 and, in fact, considered all the mitigating factors discussed above, as well as the aggravating factors in this case. We do not find that in imposing this sentence that the court abused its vast discretion, and we affirm the sentence imposed by the court, subject to the remand instructions discussed in the Errors Patent section of this opinion.

29

## CONCLUSION

Both the defendant's conviction and sentence are affirmed. This matter is remanded to the trial court for the establishment of a payment plan for the fine and court costs imposed as conditions of the defendant's probation in accordance with La.Code Crim.P. art. 875.1.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**